UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATIC CONTROL COMPONENTS, INC., | |
|     PLAINTIFF/COUNTERCLAIM<br>    DEFENDANT | |
| v. | |
| LEXMARK INTERNATIONAL, INC., | |
|     DEFENDANT/COUNTERCLAIM<br>    PLAINTIFF | Civil Action No. 04-CV-84-GFVT<br>Pending in United States District Court<br>East District of Kentucky<br>Honorable Gregory F. Van Tatenhove |
| v. | |
| WAZANA BROTHERS INTERNATIONAL,<br>INC. d/b/a MICRO SOLUTIONS ENTERPRISES | Miscellaneous Action No. 06-00474-GK |
|     COUNTERCLAIM DEFENDANT | **REDACTED** |
| v. | |
| PENDL COMPANIES, INC. | |
|     COUNTERCLAIM DEFENDANT | |
| v. | |
| NER DATA PRODUCTS, INC. | |
|     COUNTERCLAIM DEFENDANT | |

## LEXMARK INTERNATIONAL, INC.'S OPPOSITION
## TO MOTION TO QUASH LEXMARK'S SUBPOENA ON
## OPPOSING COUNSEL

Defendant and Counterclaim Plaintiff Lexmark International, Inc. ("Lexmark") opposes

the motion to quash of the law firm McDermott Will & Emery LLP ("McDermott"). McDermott

represents Static Control Components, Inc. ("Static Control").   In the underlying litigation

pending in the Eastern District of Kentucky, Lexmark asserts that Static Control willfully infringed and continues to willfully infringe Lexmark's patents. Lexmark also asserts that Pendl Companies, Inc. ("Pendl"), a customer of Static Control, willfully infringed and continues to willfully infringe Lexmark's patents. Static Control, Pendl, and two other defendants in the litigation have claimed a common interest privilege as a basis to withhold any communications between the defendants.[1]  McDermott should be ordered to produce the subpoenaed information because both Static Control and Pendl have waived attorney/client and work product privileges for all documents and communications pertaining to Lexmark's Prebate program (discussed herein).

As to McDermott, the Magistrate in the underlying Kentucky litigation has already held that McDermott's client Static Control has "waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 2006 U.S. Dist. LEXIS 40612 (E.D. Ky., June 15, 2006) (attached as Exhibit A).[2]  Static Control widely disseminated to its customers a legal opinion that it obtained from an outside attorney, Mr. Walker Blakey, discussing the enforceability, validity, and general legality of Lexmark's Prebate program ("the Blakey Opinion"). The Court in the underlying litigation properly determined that Static Control thereby waived any claim to privilege. ***Significantly, this waiver is not limited in time or to specific counsel for Static Control.***

---

[1] Despite repeated requests by Lexmark, the counterclaim defendants have refused to produce any such common interest agreement. Moreover, counterclaim defendants' common interest claim is curious given that one of the counterclaim defendants, NER Data Products, Inc. ("NER"), has asserted a cross-claim against Static Control in the underlying Kentucky litigation.

[2] Static Control has filed objections to the Magistrate's decision, and those objections are currently pending.

As to Pendl, Pendl recently decided to rely on a legal opinion from one of its attorneys ("the Becker Opinion") in an attempt to argue that any infringement by Pendl of Lexmark's patents, including Pendl's ongoing infringement, was and is somehow not willful. This opinion broadly covers a wide range of topics, including the validity and enforceability of Lexmark's Prebate program (discussed below) in view of patent, contract, and antitrust laws. Federal Circuit precedent makes clear that because Pendl has asserted its advice-of-counsel defense, Pendl automatically waived its claim for privilege and/or work product for *all* such communications (including those with trial counsel) regarding the subject matter of the Becker Opinion. ***Significantly, Pendl's waiver applies not only to communications from its litigation counsel, but also to communication with Static Control (and its counsel McDermott) relating to the subject matter of the Becker Opinion.***

It is abundantly clear that defendants cannot use their advice of counsel as both a sword (by waiving privilege to allegedly favorable opinion) and a shield (by asserting privilege to any unfavorable communications between defendants). The Federal Circuit has recently affirmed its holding that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to *all* such communications regarding the same subject matter. *In re Echostar Communications Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006). Post-*Echostar*, district courts have also confirmed that ***the scope of the waiver extends to pre-suit and post-suit communications and to communications on the same subject matter between the client and its counsel, including litigation counsel.*** The inquiry is focused therefore on the ***subject matter*** of the communications, not the timing or authors of them.

Accordingly, given the E.D. Kentucky's determination of waiver against Static Control and Pendl's voluntary waiver by virtue of its decision to assert the advice of counsel defense,

Lexmark is entitled to discovery of the entire scope of the subject matter that Static Control and

Pendl each have waived. This includes McDermott's communications with Pendl, either directly

or indirectly through Pendl's counsel or McDermott's client (Static Control), relating to the

subject matter of the Becker Opinion. McDermott's Motion to Quash should therefore be denied

and McDermott should be ordered to immediately provide the discovery requested in Lexmark's

subpoena.[3]

## I.    FACTUAL BACKGROUND

### A.    Pendl Infringes Lexmark's Patents by Remanufacturing Certain of Lexmark Toner Cartridges and Static Control Induces This Infringement

Lexmark is a manufacturer of laser printers and toner cartridges for use with those

printers. Lexmark's toner cartridges at issue in this case are covered by several of Lexmark's

patents. Lexmark sells many of its patented toner cartridges at a reduced price but subject to a

single-use patent license known as the "Prebate" program or the "Return Program." Lexmark

also sells some of its patented toner cartridges at a regular price without the single-use patent

license. The single-use license agreement currently reads:

### RETURN EMPTY CARTRIDGE TO LEXMARK FOR REMANUFACTURING AND RECYCLING

---

[3] The basis for McDermott's motion is curious because McDermott claims that its lawyers have never given any advice to any party to the underlying patent infringement litigation in the Eastern District of Kentucky, including McDermott's client (Static Control), regarding the validity or infringement of Lexmark's patents. McDermott further contends that each and every communication it has had with Pendl's counsel has been limited to "preparation for trial and pursuant to a common interest agreement." First, it strains credibility to think that McDermott has never communicated with its client (Static Control) or counsel for Static Control's customer (Pendl) the merits of Lexmark's patent infringement claims. Second, if McDermott's claims were somehow true, it would have entirely obviated the instant motion. As counsel for Lexmark has already conveyed to counsel for McDermott, Lexmark does not seek discovery of litigation or trial strategy. Instead, Lexmark seeks that to which it is entitled under *In re Echostar Communications Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006), namely communications relating to the subject matter of the Becker opinion. The fact that McDermott nonetheless filed its motion suggests that McDermott has in fact communicated with Pendl in some manner regarding subject matter falling within the scope of their waivers.

Please read before opening. Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement. This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available.

Significantly, the validity of Lexmark's single-use patent license has already been litigated and resolved in Lexmark's favor. *Arizona Cartridge Remanufacturers Association Inc., v. Lexmark International Inc.*, 421 F.3d 981, 988 (9th Cir. 2005) (Lexmark's Prebate license "permits Lexmark to restrict the use of its patented item and gives Lexmark a legal basis for asserting its ability to enforce its restriction."); *see also Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 563, fn 10 (6th Cir. 2004) (Judge Feikens' concurring opinion with respect to Count II: "Here, the [Prebate agreement] was clear and the district court could find that it supports the conclusion that there was a meeting of the minds and the agreement is enforceable.").[4]

Counterclaim Defendant Static Control, McDermott's client, is a supplier of parts and related products for use in remanufacturing (sometimes called refilling) toner cartridges after their initial use (*i.e.*, depletion of toner within the cartridge). For example, Static Control sells toner, microchips, drums, tools, and other components to its customers, who use these products to refill and otherwise remanufacture empty Lexmark toner cartridges. The end result of this remanufacturing process is to allow the cartridges to be re-used in Lexmark's laser printers. Each of the three other Counterclaim Defendants in this matter – Pendl, NER, and Micro Solutions Enterprises ("MSE") – is a customer of Static Control. Pendl, MSE, and NER each

---

[4] Single-use patent licenses, similar to Lexmark's Prebate license, are well respected in the law and have been upheld by the United States Court of Appeals for the Federal Circuit. *See, e.g., Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700. 708-709 (Fed. Cir. 1992).

buys products from Static Control to remanufacture empty Lexmark toner cartridges to then re-sell to Lexmark's customers.

Lexmark's patent claims against Static Control and these remanufacturer Defendants relate to the unlawful remanufacture and resale of Lexmark's toner cartridges. Lexmark's patent infringement claims primarily focus upon toner cartridges that Lexmark sells subject to the Prebate agreement, as described above. Lexmark's position is that the remanufacture of these single-use only cartridges by Pendl and others constitutes patent infringement, and that Static Control contributes to and/or induces Pendl's infringement. *See e.g. Mallinckrodt*, 976 F.2d at 708-709 (affirming that sale of patented products may be legally restricted to a single-use). Separately, Lexmark also asserts that the remanufacture of any toner cartridges (Prebate or non-Prebate) first sold by Lexmark outside the United States, which toner cartridges are then imported into and re-resold within the United States, likewise constitutes patent infringement. *See Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001) (holding that disposable cameras originally sold overseas that were refurbished and resold in the United States constituted patent infringement).

Significantly, the remanufacturer Defendants – including Pendl – admit to remanufacturing and reselling (1) used Lexmark Prebate cartridges; and (2) used Lexmark cartridges obtained from outside the United States. Moreover, Pendl admits that that the used Lexmark cartridges it sells are not its own products, but rather used Lexmark cartridges with no critical components replaced. There is no dispute that Static Control supplies Pendl with equipment and materials for this remanufacturing and reselling of used Lexmark Prebate cartridges and Lexmark cartridges that were first sold outside the United States.

6

**B.    Static Control's Customer – Pendl – Recently Asserted an Advice-of-Counsel Defense To Argue That Any Patent Infringement by Pendl and that was Induced by Static Control was Somehow Not Willful**

On August 25, 2005, Lexmark requested Pendl to produce "all documents and things relating to Pendl's reliance, if any, on the advice of counsel as a defense to the charge of willful infringement." (Exhibit B, Request for Production No. 48). In it's October 31, 2005 Response, Pendl objected to this request stating, *inter alia*, that this request sought documents that are protected from discovery by the attorney-client privilege and/or work product doctrine. (Exhibit C, pp. 39-40). For nearly a year, Pendl hid behind its privilege shield and avoided production of any responsive documents. On October 6, 2006, Lexmark requested that Pendl promptly make a decision as to whether or not Pendl would rely on the advice of counsel defense. (Exhibit D). On October 12, 2006, counsel for Pendl, the Stites & Harbison firm ("Stites"), stated:

> We carefully considered your request regarding Pendl's assertion of the advice of counsel defense. Please be advised that Pendl will be relying at trial on advice of counsel as one of its defenses to Lexmark's claim of willful patent infringement. In addition to all other documents previously produced in this matter, we will also produce to you a copy of the opinion of counsel tomorrow as requested in your recent letter.

See attached Exhibit E.

Although Pendl eventually produced the Becker Opinion (attached as Exhibit F), thereby waiving any claim to privilege and/or word product, it has to date failed to produce any other documents – or provide any other discovery – relating to the subject matter of the Becker Opinion. Rather, with the close of discovery in the case rapidly approaching, Pendl and its counsel – including Stites – continue to obstruct discovery by seeking a protective order from such further discovery. McDermott and its client Static Control have taken the same position as Pendl, and refuse to produce communications between Static Control and Pendl relating to the same subject matter each has waived.

C.    **McDermott Does Not Deny Having Communications With Pendl's Counsel That Are Responsive To The Subpoena, Including Advice Relating to Lexmark's Prebate Program**

McDermott's motion does not deny it had communications with at least Pendl's counsel that are responsive to the subpoena to McDermott. Indeed, McDermott admits it "has participated with other counsel for Static Control and counsel of all of the co-[counterclaim] defendants" pursuant to a "written common interest agreement." *See* Declaration of William H. Barrett, accompanying McDermott's motion, at paragraph 8. Lexmark has requested opposing counsel, including McDermott to provide a copy of the common interest agreement, but the opposing parties have refused to do so. Moreover, counterclaim defendants' common interest claim is curious given that one of the counterclaim defendants, NER Data Products, Inc. ("NER"), has asserted a cross-claim against Static Control in the underlying Kentucky litigation.

As the supplier of products to the remanufacturer defendants (including Pendl), it is McDermott's client (Static Control) who the remanufacturers have likely looked to as a source documents, information, and advice relating to Lexmark's Prebate program including the invalidity, unenforceability, and non-infringement positions against Lexmark's patents.

Most significantly, Mr. Barrett's Declaration does not deny that McDermott has provided advice to Pendl's counsel relating to the validity of Lexmark's Prebate Program, and the related enforceability of Lexmark's patents under that program. Lexmark is entitled to discovery on such advice – which is different and distinct from litigation or trial strategy.

II.    **PENDL AND MCDERMOTT'S CLIENT STATIC CONTROL HAVE WAIVED COMMUNICATIONS RELATING TO LEXMARK'S PREBATE PROGRAM**

Is it well settled that when a party voluntarily discloses privileged communications to a third party, that disclosing party waives its attorney-client privilege and work product immunity protections for all documents on the same subject matter. *In re Columbia/HCA Healthcare*

8

*Corp. Billing Practices Litig.*, 293 F.3d 289, 302-07 (6th Cir. 2002). It is also well established

that when a party puts its counsel's advice at issue in a case, that party waives attorney-client

privilege and work product protections with respect to the subject matter of that advice. *In re*

*Powerhouse Licensing*, 441 F.3d 467 473 (6th Cir. 2006) ("[C]ertain statements contained in the

affidavit represented opinions . . . that go to the heart of the legal claims at issue. By including

these communications in the affidavit, counsel for petitioners effectively waived the attorney-

client privilege.").

Similarly, the Federal Circuit has long held that "[o]nce a party announces that it will rely

on advice of counsel, for example, in response to an assertion of willful infringement, the

attorney-client privilege is waived." *In re Echostar Communications Corp.*, 448 F.3d 1294,

1299 (Fed. Cir. 2006).[5] "The widely applied standard for determining the scope of a waiver of

attorney-client privilege is that the waiver applies to all other communications relating to the

same subject matter." *Id.*, citing *James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir.

2005). This rule of law is necessary to prevent the "inequitable result that the waiving party

could use the attorney-client privilege as both a sword and a shield by selectively waiving only

---

[5] *See, e.g., In re EchoStar*, 448 F.3d at 1299 ("[W]hen EchoStar chose to rely on the advice of
in-house counsel, it waived the attorney-client privilege with regard to any attorney-client
communications relating to the same subject matter, including communications with counsel
other than in-house counsel"); *Fort James Corp v. Solo Cup Co.*, 412 F.3d 1340, 1350-51 (Fed.
Cir. 2005) (finding that the disclosure of counsel's legal advice in a development engineering
report waived the attorney-client privilege for other documents on the same subject matter);
*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (finding attorney-client privilege
waived when party "retained the attorneys primarily for the commercial purpose of obtaining
written tax opinions to include in their coal lease promotion brochures rather for their own
guidance"); *Convolve, Inc. v. Compaq Computer Corp.*, 224 F.R.D. 98, 104 (S.D.N.Y. 2004)
(attorney-client privilege waived "with respect to all communications not only with [opinion
counsel], but also with its other attorneys, including trial counsel, concerning the subject matter
of [the legal opinion]"); *Union Pac. Res. Co. v. Natural Gas Pipeline Co.*, Case No. 90 C 5378,
1991 WL 105505, at *4 (N.D. Ill. June 10, 1991)("The circumstances of UPR's 1985 disclosure
dictate that it has waived the attorney-client privilege as to not only the documents it produced in
1985, but as to all others on the same subject matter.") (attached as Exhibit G).

favorable advice, and asserting privilege on unfavorable advice regarding the same subject matter." *Id. at 1301*.

Thus, "when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to *all* such communications [whether written or oral] regarding the same subject matter." *Id.* at 1301 (emphasis added). The alleged infringer "waives its immunity for any document or opinion that embodies or discusses a communication to or from it concerning whether that patent is valid, enforceable, and infringed by the accused." *Id.* at 1304. "This waiver ... includes not only any letters, memorandum, conversation, or the like between the attorney and his or her client, but also includes, when appropriate, any documents referencing a communication between attorney and client." *Id.*

Here, it is undisputed that Pendl asserts an advice-of-counsel defense. Under *Echostar*, Pendl automatically waived immunity for any document or opinion that embodies or discusses a communication to or from it concerning the subject matter of the Becker Opinion. *Id.* at 1304. Pendl's waiver includes not only any letters, memorandum, conversation, or the like between Pendl's counsel and Pendl, but also includes, when appropriate, any documents referencing a communication between Pendl's counsel and Pendl. *Id.*

McDermott's client Static Control has similarly "waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 2006 U.S. Dist. LEXIS 40612 (E.D. Ky., June 15, 2006) (attached as Exhibit A). Specifically, Static Control publicly disclosed an opinion by a law professor, Richard Blakey, which expressed Mr. Blakey's opinions concerning the enforceability, validity, and general legality of Lexmark's Prebate program ("the Blakey Opinion"). *Id.* A complete copy of the five-page Blakey Opinion was attached to a letter dated

September 11, 1998, that Static Control's General Counsel, William L. London, sent to its customers to induce its customers to continue in its infringing conduct. *Id.* The Magistrate in the underlying Kentucky litigation has held that Static Control "has waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program. *Id.*

### A.    Pendl's and McDermott's Client Static Control's Waiver Applies To Communications Between Them Relating to Lexmark's Prebate Program

As noted above, McDermott does not dispute that it provided advice to Pendl's counsel on the alleged enforceability of Lexmark patents. The Declaration of McDermott's Mr. Barrett does not state that such advice was covered under the alleged common interest agreement. Thus, such advice is not privileged under an alleged common interest agreement, and Lexmark is entitled to discovery on all such non-privileged communications.

As previously noted, the infringement defendants have ***refused to produce the alleged common interest agreement*** despite repeated requests by Lexmark. Having failed to produce the alleged common interest agreement, McDermott has not carried its burden in proving that advice it provided to Pendl's counsel on the alleged enforceability of Lexmark patents is privileged under the alleged common interest agreement.[6]

Even if it is somehow deemed that a common interest agreement exists, both Pendl and McDermott's client Static Control have waived privilege to communications between them

---

[6] Moreover, the alleged common interest agreement should not be given any weight by this Court because the parties' legal interests do not coincide as evidenced by the fact that NER has asserted a claim against and has served discovery on Static Control. *See, e.g., North River Ins. Co. v. Columbia Casualty Co.*, No. 90-2518, 1995 WL 5792, at *5 (S.D.N.Y. Jan. 5, 1995) (holding that the common interest doctrine does not apply between two parties with divergent legal interests and explaining that "[w]hile [the parties'] commercial interests coincided to some extent, their legal interests sometimes diverged, as demonstrated by the instant litigation"). A copy of this case is attached as Exhibit H.

relating to the validity, enforceability, and infringement of Lexmark patents. *See Echostar* and the Magistrate's decision in the underlying Kentucky litigation, *supra.*

### B.    Waiver of Privilege and Work Product Applies to Litigation Counsel

To be clear, Lexmark is not seeking litigation or trial strategy from McDermott. Nor does Lexmark seek from McDermott communications between McDermott and its client Static Control that do not relate the validity or enforceability of the Lexmark's patents under the Lexmark Prebate Program, or infringement by Pendl, *i.e.,* the subject matter of the Becker Opinion. But Pendl's and Static Control's waiver applies to many other documents and/or information that McDermott has that does not constitute litigation or trial strategy. For example, McDermott's advice to Pendl's counsel that was then provided to Pendl regarding the enforceability Lexmark's patents has been waived by Pendl and is discoverable. McDermott's communications with Pendl's counsel regarding which witnesses to use to present Static Control's and/or Pendl's case of patent unenforceability is litigation or trial strategy that Lexmark does not seek.

McDermott's argument that there has been no waiver of any privilege as to communications with trial counsel by asserting the advice of counsel defense has no merit. McDermott's motion entirely ignores that the Federal Circuit's recent decisions *In re Echostar Communications Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) and *James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005), *supra*, govern here.[7]  The Federal Circuit held in *Echostar* that

---

[7] District court cases cited by McDermott, *i.e., Intex Recreation Corp. v. Metalast*, Civ. No. 01-1213 (JDB), 2005 U.S. Dist. LEXIS 10149 (D.D.C. March 2, 2005), and *Dunhall Pharms v. Discus Dental*, 994 F. Supp. 2d 1202 (C.D. Cal. 1998), and *Motorola v. Vosi Techs.*, 2002 U.S. Dist. LEXIS 15655 (N.D. Ill. 2002), all pre-date the Federal Circuit's decisions in *Echostar* and *James Corp.* and therefore are not controlling. *Intex Rec. Corp. v. Team Worldwide Corp.*, 439 F. Supp. 2d 46 (D.D.C. 2006), cited in footnote 13 of McDermott's Motion, held that *Echostar* "does not provide authority for the narrow subject matter waiver of the attorney-client and work product protections which [the accused infringer] urges." *Id.* at 51. Thus, the Court held that the

waiver of opinions *does extend* to advice and work product given after litigation began "when the advice is relevant to relevant to ongoing willful infringement, so long as that ongoing infringement is at issue in the litigation." *In re Echostar Communications Corp.*, 448 F.3d at 1303, citing with approval *Akeva LLC,* 243 F. Supp. 2d 418, 423 (M.D.N.C. 2003) ("Once a party asserts the defense of advice of counsel, this opens to inspection the advice received during the entire course of the alleged infringement."), and *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,* 246 F.3d 1336, 1351-1353 (Fed. Cir. 2001) (noting that an infringer may continue its infringement after notification of the patent by filing suit and that the infringer has a duty of due care to avoid infringement after such notification). Here, Lexmark asserts ongoing willful infringement by Pendl.

The *Echostar* Court's favorable citing to *Akeva* is particularly important here. In *Akeva*, the court held that "all opinions received by the client relating to infringement must be revealed, *even if they come from defendants' trial attorney*." 243 F. Supp. 2d at 423 (emphasis added). While *Echostar* did not involve trial counsel, the supporting citation to *Akeva* in describing the scope of the waiver, together with the reasoning of the *Echostar*, Court shows Pendl's waiver extends to *all* attorneys who provided advice to Pendl on whether each of Lexmark's patents is valid, enforceable, or infringed by Pendl. Such advice includes the scope, validity and/or enforceability of Lexmark's Prebate Program. In short, *the scope of the waiver extends to pre-suit and post-suit communications and to communications on the same subject matter between Pendl and all other counsel, including Pendl's litigation counsel.*

---

accused infringer "waived the attorney-client and work product privileges 'for any document or opinion that embodies or discusses a communication to or from it concerning whether the [asserted patent] is valid, enforceable and infringed.'" *Id.* Moreover, the Court held that the accused infringer "must provide 'all testimony and produce all documents' generated by its counsel subsequent to [the waived opinion] which either 'question or contradict in any way the competence or validity of the opinions rendered.'" *Id.* at 53.

McDermott's arguments to the contrary are fundamentally at odds with the principal purpose of the waiver doctrine, which is to protect against the unfairness that would result from a party selectively disclosing legal advice for its own benefit, revealing only the advice that supports its cause while claiming the shelter of privilege to avoid disclosing other advice on the same subject matter that is less favorable.  *See, e.g., In re EchoStar*, 448 F.3d at 1301 ("However, selective waiver of the privilege may lead to the inequitable result that the waiving party could waive privilege for favorable advice while asserting its privilege on unfavorable advice.  In such a case the party uses the attorney-client privilege as both a sword and a shield.  To prevent such abuses we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.") (citing *XYZ Corp v. United States*, 348 F.3d 16, 24 (1st Cir. 2003) and *Fort James Corp.*, 412 F.3d at 1349).

As noted above, both McDermott's client Static Controls and Pendl have waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program.  Static Controls waived by disclosing the Blakey Opinion, and Pendl waived by disclosing the Becker Opinion.  Fairness dictates that Lexmark be allowed to access all documents and communications, from any counsel at any time period, discussing, casting doubt, or contradicting all subject matter contained in that opinion that was provided to either Static Control and Pendl either directly or via their respective counsel.  It would be fundamentally unfair to permit Static Control and Pendl to disclose favorable legal opinions, but yet allow Static Control and Pendl to protect unfavorable communications that go to the heart of Lexmark's patent infringement allegations under the guise of the attorney-client privilege and/or work product immunity.

14

Significantly, McDermott fails to cite a single Federal Circuit case that holds waiver does not extend to advice of litigation counsel when that advice is relevant to ongoing willful infringement at issue in the litigation. McDermott ignores that district courts applying the Federal Circuit holdings in *Echostar* have held that waiver extends to advice of litigation counsel when the advice is relevant to ongoing willful infringement at issue in the case.

### 1.    The Court in the Underlying Litigation has Already Found Waiver to Extend to Litigation Counsel

The Magistrate in the present, underlying case has already ruled consistently with Lexmark's position in a similar manner against McDermott's client Static Control. *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 2006 U.S. Dist. LEXIS 40612 (E.D. Ky., June 15, 2006) (Ex. A). The Magistrate ruled that Static Control waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program. *Id.* at Slip Op. 20-23. The Magistrate in the underlying case ordered Static Control "to produce *all documents*, both privileged and non-privileged, relating to Static Control's efforts to defeat Lexmark's Prebate program." *Id.* at Slip Op. 23. The Magistrate's Order includes waiver with respect to litigation counsel.

Thus, even if McDermott's communications to Pendl were somehow covered under the alleged common interest agreement, McDermott's client Static Control has waived such communications. It would be inequitable for Static Control to use the attorney-client privilege as both a sword and a shield just as much as it is inequitable for Pendl to do so.

### 2.    In at Least One Other Litigation Involving McDermott, a Court has Found Waiver to Extend to Litigation Counsel

In one recent district court case wherein McDermott was litigation counsel for an accused infringer (Seagate) who asserted the advice-of-counsel defense, it was held that waiver applied to McDermott. *Convolve, Inc. v. Compaq Computer Corp. and Seagate Technology, Inc.*, 2006

15

U.S. Dist. LEXIS 69425 (S.D.N.Y., September 27, 2006) attached as Exhibit I, denying interlocutory appeal of Magistrate's Memorandum and Order reported at 224 F.R.D. 98 (S.D.N.Y., May 28, 2004).

In *Convolve,* McDermott's client Seagate placed at issue the advice of its opinion counsel (Mr. Sekimura). The Magistrate held that "Seagate has therefore waived the privilege with respect to all communications not only with Mr. Sekimura, but also with its other attorneys, including trial counsel, concerning the subject matter of Mr. Sekimura's advice." 224 F.R.D. at 104. The Magistrate held that "trial counsel's advice that undermines the reasonableness of the client's reliance on advice of opinion counsel must be disclosed even if it is communicated in the context of trial preparation." *Id.* The Magistrate held that "to the extent that Seagate wishes to withhold or redact documents that would reveal trial strategy or planning, it shall submit those documents for my in camera review." *Id.*

> With respect the waiver of attorney-client communications, the Magistrate held:

> For the foregoing reasons, the plaintiffs' motion with respect to Seagate's waiver of the attorney-client privilege is granted. Seagate shall produce all documents, answers to interrogatories, and deposition testimony concerning communications between Seagate (or its in-house counsel) and any of its attorneys, ***including trial counsel***, with respect to the subject matter of Mr. Sekimura's opinions, i.e., the infringement, validity, and enforcement of the *'635, '267,* and '473 patents. The time period of the waiver runs from the time Seagate became aware of the patents at issue and continues until such time as Seagate's alleged infringement ends. Any communications between Seagate and its trial counsel concerning the subject matter of Mr. Sekimura's opinions that also relate to trial strategy or planning shall be submitted for my review. 224 F.R.D. at 105. (emphasis added) (footnote omitted).

> With respect to waiver of work product, the Magistrate held:

> [T]he communicated work product of any of Seagate's attorneys is discoverable under Seagate's waiver of the attorney-client privilege. Such communicated work product shall include materials disclosing the fact or substance of Seagate's (or in-house counsel's) communications with any outside counsel; accordingly, this order encompasses the plaintiffs' request for

"documents reflecting oral communications . . . between [Seagate] and outside counsel" that relate to the subject matter of the Sekimura opinions. 224 F.R.D. at 107.[8]

Similarly, other district court's have applied the holdings of *Echostar*. *See Computer Associates International, Inc. v. Simple.com, Inc.*, 2006 U.S. Dist. LEXIS 77077 (E.D.N.Y., October 23, 2006), attached as Exhibit J. In *Computer Associates*, ongoing infringement was at issue, and the accused infringer (Computer Associates, "CA") chose to rely on advice of counsel from one firm (Cooper & Dunham), but refused to produce any communications between it and its litigation counsel (Heller Ehrman or its prior trial counsel) claiming attorney-client privilege. The district court adopted a Report and Recommendation of a Special Master, and granted the patent owner's motion to compel. In its ruling, the district court relied on the Federal Circuit's holdings in *Echostar*. The district court held that the "Special Master's holding that the waiver extends to trial counsel is consistent with *Echostar*." Slip op. at 12-13. The district court held that "excluding trial counsel from the scope of the waiver would permit a party to use the attorney-client privilege as both a sword and shield by allowing a party to choose which opinions are disclosed and which are not." *Id.* The district court held that "[l]itigation strategy and advice of counsel are not the same and the Special Master's Recommendation recognized the difference by providing CA an opportunity to submit materials for his *in camera* review. Slip op. at 14.

As shown above, in post-*Echostar*[9] cases *Convolve and Computer Associates* cases, district courts have held that waiver extends to litigation counsel. Indeed, in *Convolve*, the waiver was held to extend to litigation counsel McDermott.

---

[8] The District Court denied Seagate's motion to overrule the Magistrate Judge's decision. The District Court also denied Seagate's motion to certify the issue for interlocutory appeal. Seagate has now filed a Petition with the Federal Circuit for a Writ of Mandamus. McDermott is well aware of the District Court's application in *Convolve* of the holdings in *Echostar*, including the waiver extending to litigation counsel.

17

###### 3.    In at Least One Other Litigation Involving Pendl's Counsel Stites, a Court has Found Waiver to Extend to Litigation Counsel

In one recent district court case wherein McDermott's co-counsel Stites was initial litigation counsel for an accused infringer (Union Rich) who asserted the advice-of-counsel defense, a subpoenaed Stites attorney (Ms. Mandy Decker) was ordered to produce: "All documents that reflect communications (including all electronic communications) between Ms. Decker and Union Rich that relate to the scope, validity, infringement, and/or enforceability of the patents, including any and all attorney notes, summaries, documents and drafts of documents related to the same subject matters and that embody or discuss a communication between Ms. Decker and Union Rich." *Outside The Box Innovations, LLC, d/b/a Union Rich USA v. Travel Caddy, Inc. et al.,* 2006 U.S. Dist. LEXIS 74060 (N.D. Ga., October 5, 2006). A copy of this case is attached as Exhibit K.

The *Union Rich* court also ordered "Any such document that includes Ms. Decker's opinions or mental impressions never communicated to Union Rich may be redacted to exclude those uncommunicated portions." *Id.* The district court also ordered "Ms. Decker may redact any information that she considers solely related to trial strategy." *Id.*

---

[9] McDermott argues that in the *Echostar* case, the district court denied discovery into opinions by litigation counsel. Constantine is wrong. In *Tivo v. Echostar,* Civ. No. 2:04-CV-1, 2005 U.S. Dist. LEXIS 42481, at **16-19 (E.D. Tex. Sept. 26, 2005) the district court discussed the extent of waiver with respect to post-filing communications and stated "Where documents or communications may contain both information related to the advice of counsel defense as well as information related solely to trial strategy, in camera review may be necessary." As noted in *Computer Associates*, "*EchoStar* did not involve trial counsel. However, the *EchoStar* Court, in describing the scope of the waiver of the attorney-client privilege, cited favorably to *Akeva,* wherein the Court held that 'all opinions received by the client relating to infringement must be revealed, even if they come from defendants' trial attorney.' *243 F. Supp. 2d at 423.*" *Computer Associates International, Inc. v. Simple.com, Inc.,* 2006 U.S. Dist. LEXIS 77077 at *13 (E.D.N.Y., October 23, 2006), attached as Exhibit J.

The district court also ordered "Furthermore, consistent with the *Echostar* holding, the overall scope of Union Rich's waiver in relying on the advice-of-counsel defense includes:

> Any document or opinion that embodies or discusses a communication to or from Union Rich concerning whether the patents are valid, enforceable, and infringed by Union Rich, *regardless of the counsel involved*, and *regardless of the date*. Any such document or opinion that falls within the scope of the waiver, but which includes opinions or mental impressions never communicated to Union Rich, may be redacted to exclude those uncommunicated portions. Union Rich may redact any information that it considers solely related to trial strategy." *Id* (emphasis added).

Lexmark requests a similar Order issue in the present case. *See* Lexmark's Proposed Order concurrently filed herewith.

In sum, McDermott's client Static Control voluntarily waived by disclosing the Blakey Opinion (*see* Exhibit A), and Pendl elected to inject the Becker Opinion as part of its defense in this case – Static Control and Pendl should not be allowed to produce only the privileged information which they deem helpful, and to withhold the rest. Equity compels a finding that Static Control and Pendl waived its attorney-privilege and work product protections without any temporal limitations or limitations as to counsel.

## III.    LEXMARK'S SUBPOENA SEEKS DISCOVERY FROM MCDERMOTT OF THE VERY SUBJECT MATTER THAT BOTH MCDERMOTT'S CLIENT STATIC CONTROL AND PENDL WAIVED

Lexmark's subpoena to McDermott seeks discovery of Pendl's communications with McDermott, including communications through Pendl's counsel, regarding the same subject matter as the opinion of counsel that was expressly waived by McDermott's client Static Control and Pendl. Static Control voluntarily waived the Blakey Opinion and Pendl's expressly waived opinion of counsel includes attorney Robert Becker's statement to Randy Pendl: "

[REDACTED]

[REDACTED]

." (Exhibit F, p. 1) (emphasis added).

McDermott does not dispute that each of the requests in Lexmark's subpoena to McDermott is directed to the same subject matter that the Magistrate found Static Control waived in the underlying Kentucky litigation. McDermott does not dispute that each of the requests in Lexmark's subpoena to McDermott is directed to the same subject as Pendl's expressly waived opinion from attorney Becker. In short, Lexmark's subpoena is directed to the discovery that it is entitled to by virtue of Static Control's voluntary disclosure of the Blakey Opinion, and Pendl's decision to rely on the advice of counsel defense. If the scope of the discovery that Lexmark seeks is broad, it's because the Blakey Opinion and the Becker Opinion broadly covers many issues relating to patent, contract and antitrust laws.

## IV.    THE SUBPOENA TO MCDERMOTT IS PROPER IN ALL OTHER RESPECTS

In addition to incorrectly arguing for a narrow scope of waiver, McDermott also raises a number of other miscellaneous arguments, none of which have any merit.

### A.    McDermott is Subject to Deposition Testimony Resulting from Static Control's and Pendl's Respective Decisions to Waive Privilege

McDermott argues that Lexmark should not be allowed to depose trial counsel. This argument has been rejected by at least one post-*Echostar* court. *See Convolve*, *supra*, wherein Seagate was ordered to "produce all documents, answers to interrogatories, and deposition testimony concerning communications between Seagate (or its in-house counsel) and any of its attorneys, including trial counsel [McDermott]," related to the subject matter of the Sekimura Opinions. 224 F.R.D. at 105. As noted above, McDermott's client Static Control waived by disclosure of the Blakey Opinion, and Pendl waived by disclosure of the Becker Opinion. As

further noted above, the subject matter of the waived Blakey Opinion and the Becker Opinion is the same. Not allowing Lexmark to depose trial counsel for Static Control (which waived the Blakey Opinion) who communicated with Pendl, either directly or via Pendl's counsel, regarding the regarding the validity, enforceability and/or infringement of Lexmark patents would be contrary to the holdings by the Federal Circuit in *Echostar* and the Magistrate's holding on Static Control's waiver in the underlying Kentucky litigation.

The Declaration by McDermott's attorney William H. Barrett states that McDermott "has not provided any party to this litigation, including Static Control, with an opinion as to the validity or infringement of any patent." It strains credibility that McDermott never communicated with Static Control regarding the validity of the Blakey Opinion, and that McDermott never communicated with Pendl or Pendl's counsel regarding the validity of the Becker Opinion. Mr. Barrett's Declaration is silent as to whether McDermott ever provided advice to Pendl via Pendl's counsel regarding the subject matter of the Blakey Opinion or the subject matter of the Becker Opinion, i.e., the validity of Lexmark's Prebate Program, the enforceability of Lexmark's patents against Pendl, and the infringement of Lexmark's patents. McDermott's Motion itself suggests that McDermott has at least communicated with Pendl through Pendl's counsel Stites regarding subject matter falling within the scope of the waiver.

## B.    Lexmark's Subpoena is Directed to the Subject Matter of Static Control's and Pendl's Waivers

Contrary to McDermott's argument, the subpoena is not overly broad/duplicative/burdensome. The *Echostar* case makes clear that Lexmark is entitled to all documents and testimony relating to the subject matter "discussed in Robert Becker's letter to Randy Pendl of August 26, 1999." *Echostar* recognizes that this "waiver of both the attorney-client privilege and the work-product immunity includes not only any letters, memorandum,

21

conversation, or the like between the attorney and his or her client, but also includes, when appropriate, any documents referencing a communication between attorney and client." 448 F.3d at 1304. Such internal notes kept by McDermott about communications with Pendl and/or Pendl's counsel would be in the possession of McDermott, and not in the possession of anyone else.

**C.     McDermott Has Had More Than Adequate Time to Respond to the Subpoena**

Contrary to McDermott's argument, the subpoena provides sufficient response time by McDermott. Nine days is more than enough time for McDermott to gather the requested documents and prepare for a deposition, particularly when its client's customer, Pendl, delayed more than a year before deciding to waive its advice-of-counsel, and decided to only reveal its intention just one month prior to the November 15, 2006 close of discovery in this case.

Indeed, shortly after Pendl stated its intention to rely on the advice of counsel defense, counsel for Lexmark promptly requested that Pendl provide the discovery subject to waiver under *Echostar* and *Union Rich* (*i.e., Outside The Box Innovations, LLC, d/b/a Union Rich USA v. Travel Caddy, Inc. et al.,* 2006 U.S. Dist. LEXIS 74060 (N.D. Ga., October 5, 2006)). *See* attached Exhibit I. Moreover, to facilitate resolution of the subpoena to McDermott, Lexmark offered to have the subpoena held in abeyance until the Eastern District of Kentucky ruled on a related motion for protective order filed by Pendl on the scope of its waiver. McDermott did not agree to this offer, and therefore, it is McDermott that is forcing the McDermott subpoena to be litigated in this court. McDermott should not be heard to argue that Lexmark's actions are wrongly burdening this court.

**D.**     **McDermott is not Entitled to Attorneys Fees**

In the event that the court grants McDermott's Motion to Quash, which it should not do for the above reasons, the Court should not award attorney fees to McDermott or to Static Control. *Echostar*, the Magistrate's holding of Static Control's waiver in the underlying Kentucky litigation, and the subsequent district court cases following *Echostar*, clearly provide a basis for the discovery that Lexmark is seeking under its subpoena to Stites.

**V.     CONCLUSION**

Co-Defendants Static Control and Pendl should not be allowed to use the advice they received as both a sword, by waiving privilege to allegedly favorable advice (the Blakey Opinion and the Becker Opinion), and a shield, by asserting privilege as to all other advice on the same subject matter as the Blakey Opinion and the Becker Opinion.  Because Static Control waived the Blakey Opinion and Pendl has asserted an advice-of-counsel defense regarding willful infringement of Lexmark's patents by waiving the Becker Opinion, Federal Circuit precedent makes clear that they each waived immunity for any document or opinion that embodies or discusses any communication to or from each of them concerning whether Lexmark's patents are valid, enforceable, or infringed.  This Court should deny McDermott's Motion to Quash and order McDermott to immediately provide the discovery requested in Lexmark's subpoena.

Respectfully submitted,

Dated: November 13, 2006

By: _____

Joseph M. Potenza
Robert S. Katz
Frederic M. Meeker
Christopher B. Roth
BANNER & WITCOFF, LTD.

1001 G Street, N.W., Suite 1100
Washington, DC 20001
Telephone: (202) 824-3000
Facsimile: (202) 824-3001

Mark T. Banner
Christopher J. Renk
Timothy C. Meece
Binal J. Patel
Matthew P. Becker
Jason S. Shull
Robert H. Resis
Allen E. Hoover
Bradley Rademaker
BANNER & WITCOFF, LTD.
10 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 463-5000
Facsimile: (312) 463-5001

Andrew CopenHaver
Hada Haulsee
WOMBLE CARLYLE SANDRIDGE
AND RICE, PLLC
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3629
Facsimile: (336) 721-3660

Charles E. Shivel, Jr.
Steven B. Loy
Hanly A. Ingram
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507
Telephone: (859) 231-3000
    Facsimile: (859) 253 1093

**Attorneys for**
**Defendant/Counterclaim Plaintiff,**
**Lexmark International, Inc.**

## CERTIFICATION

This is to certify that a true and accurate copy of the foregoing has been served November 13, 2006 via email (on * individuals) and U.S. Mail as follows:

## COUNSEL FOR STATIC CONTROL COMPONENTS, INC.

| | |
|---|---|
| Mickey T. Webster<br>W. Craig Robertson, III<br>WYATT, TARRANT & COMBS, LLP<br>250 West Main Street, Suite 1600<br>Lexington, KY 40507 | Seth D. Greenstein *<br>CONSTANTINE CANNON, PC<br>1627 Eye Street, N.W.<br>Tenth Floor<br>Washington, DC 20006 |
| Paul E. Poirot *<br>William H. Barrett<br>Melise R. Blakeslee<br>John R. Fuisz<br>Stefan M. Meisner<br>MCDERMOTT, WILL & EMERY<br>600 13th Street, N.W.<br>Washington, D.C. 20005-3096 | Kevin M. Bolan<br>MCDERMOTT, WILL & EMERY<br>28 State Street<br>Boston, MA 02109-1775 |
| William L. London<br>STATIC CONTROL COMPONENTS, INC.<br>3010 Lee Avenue, P.O. Box 152<br>Sanford, North Carolina 27331 | Allison W. Freedman<br>James B. Heaton, III<br>BARTLIT BECK HERMAN PALENCHAR &<br>SCOTT, LLP<br>54 W. Hubbard Street<br>Chicago, IL 60610 |
| Joseph C. Smith, Jr. *<br>Alison G. Wheeler<br>BARTLIT BECK HERMAN PALENCHAR &<br>SCOTT, LLP<br>1899 Wynkoop Street, 8th Floor<br>Denver, CO 80202 | |

## COUNSEL FOR WAZANA BROTHERS INTERNATIONAL, INC. d/b/a MICRO SOLUTIONS ENTERPRISES

| | |
|---|---|
| Andrew D. DeSimone<br>Douglas L. McSwain<br>STURGILL, TURNER, BARKER<br>& MOLONEY, PLLC<br>155 E. Main St., Suite 400<br>Lexington, KY 40507-1317 | A. Steven Dotan ✳<br>Darren S. Enenstein<br>Geronimo Perez<br>Ned Gelhaar<br>O. Andrew Wheaton<br>Stephen J. Rafferty<br>MOLDO, DAVIDSON, FRAIOLI, SEROR &<br>SESTANOVICH, LLP<br>2029 Century Park East, 21st Floor<br>Los Angeles, CA 90067 |
| Elizabeth L. Swanson<br>SWANSON AND ASSOCIATES<br>9454 Wilshire Boulevard<br>Suite 500<br>Beverly Hills, CA 90212 | Steven P. Bogart<br>REINHART BOERNER VAN DEUREN S.C.<br>1000 N. Water Street<br>Suite 2100<br>Milwaukee, WI 53202 |

## COUNSEL FOR NER DATA PRODUCTS, INC.

| | |
|---|---|
| Andrew C. Oatway<br>MORISI & OATWAY<br>1400 Hancock St., 3rd Floor<br>Quincy, MA 02169 | Thomas C. O'Konski<br>Michael R. Reinemann ✳<br>CESARI & MCKENNA, LLP<br>88 Black Falcon Avenue<br>Boston, Massachusetts 02210 |
| Jay E. Ingle<br>JACKSON & KELLY<br>175 E. Main Street<br>P.O. Box 2150<br>Lexington, KY 40588 | Daniel E. Danford<br>Elizabeth L. Thompson<br>STITES & HARBISON, PLLC<br>250 W. Main Street<br>2300 Lexington Financial Officer<br>Lexington, KY 40507 |

**COUNSEL FOR PENDL COMPANIES, INC.**

| | |
|---|---|
| Joel T. Beres ✱<br>Jack A. Wheat<br>Jennifer L. Kovalcik<br>William Charles Ferrell, Jr.<br>STITES & HARBISON, PLLC<br>400 West Market Street<br>Suite 1800<br>Louisville, KY 40202-3352 | James R. Michels ✱<br>STITES & HARBISON, PLLC<br>424 Church Street<br>Suite 1800<br>Nashville, TN 37219 |
| David H. Weber<br>LIEBMANN, CONWAY, OLEJNICZAK &<br>JERRY, S.C.<br>231 South Adams Street<br>Green Bay, WI 54301 | Michael P. Foley<br>RENDIGS, FRY, KIELY & DENNIS, L.L.P.<br>900 Fourth & Vine Tower<br>One West Fourth Street<br>Cincinnati, OH 45202-3688 |

BY: _____

ATTORNEYS FOR LEXMARK

# EXHIBIT A

LEXSEE

**STATIC CONTROL COMPONENTS, INC., PLAINTIFF/COUNTERCLAIM, DEFENDANT v. LEXMARK INTERNATIONAL, INC., DEFENDANT/COUNTERCLAIM, PLAINTIFF v. WAZANA BROTHERS INTERNATIONAL, INC., d/b/a MICRO SOLUTIONS ENTERPRISES, PENDL COMPANIES, INC., and NER DATA PRODUCTS, INC., COUNTERCLAIM, DEFENDANTS**

**CIVIL ACTION NO. 04-84-GFVT**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY, LEXINGTON DIVISION**

*2006 U.S. Dist. LEXIS 40612*

**June 15, 2006, Decided**

**PRIOR HISTORY:** *Static Control Components, Inc. v. Lexmark Int'l, Inc., 2006 U.S. Dist. LEXIS 22669 (E.D. Ky., Apr. 6, 2006)*

**COUNSEL:** [*1] For Static Control Components, Inc., Plaintiff: Allison W. Freedman, James B. Heaton, III, Barlit Beck Herman Palenchar & Scott, LLP - Chicago, Chicago, IL; John R. Fuisz, Melise R. Blakeslee, Paul E. Poirot, Stefan M. Meisner, William H. Barrett, McDermott, Will & Emery - Washington, Washington, DC; Joseph C. Smith, Jr., Barlit Beck Herman Palenchar & Scott, LLP - Denver, Denver, CO; Kevin B. Bolan, McDermott, Will & Emery - Boston, Boston, MA; Mickey T. Webster, W. Craig Robertson, III, Tarrant & Combs LLP - Lexington, Lexington, KY; Seth D. Greenstein, Constantine Cannon, PC, Washington, DC US; William L. London, III, Static Control Components, Sanford, NC.

For Lexmark International, Inc., Defendant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem, NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian [*2] Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

For NER Data Products, Inc., Cross Claimant: Jay Edward Ingle, Jackson & Kelly, Lexington, KY; Michael R. Reinemann, Thomas C. O'Konski, Cesari & McKenna, LLP, Boston, MA.

For American Family Mutual Insurance Company, Intervenor: Amy E. Wochos, Terry J. Booth, Piper & Schmidt, Milwaukee, WI, US.

For Lexmark International, Inc., Counter Claimant: Binal J. Patel, Mark T. Banner, Matthew P. Beeker, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL; Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC, US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem, NC.

For Static Control Components, Inc., Counter Defendant: Alison G. Wheeler, Bartlit Beck Herman [*3] Palenchar & Scott LLP, Denver, CO, US; Allison W. Freedman, James B. Heaton, III, Barlit Beck Herman Palenchar & Scott, LLP - Chicago, Chicago, IL; John R. Fuisz, Melise R. Blakeslee, Paul E. Poirot, Stefan M. Meisner, William H. Barrett, McDermott, Will & Emery - Washington, Washington, DC; Joseph C. Smith, Jr., Barlit Beck Herman Palenchar & Scott, LLP - Denver, Denver, CO; Kevin M. Bolan, McDermott, Will & Emery - Boston, Boston, MA; Mickey T. Webster, W. Craig Robertson, III, Tarrant & Combs LLP - Lexington, Lexington, KY;

Seth D. Greenstein, Constantine Cannon, PC, Washington, DC US; William L. London, III, Static Control Components, Sanford, NC.

For Lexmark International, Inc., Counter Claimant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem, NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian Loy, [*4] Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

For Static Control Components, Inc., Counter Defendant: Alison G. Wheeler, Bartlit Beck Herman Palenchar & Scott LLP, Denver, CO US; Allison W. Freedman, James B. Heaton, III, Barlit Beck Herman Palenchar & Scott, LLP - Chicago, Chicago, IL; John R. Fuisz, Melise R. Blakeslee, Paul E. Poirot, Stefan M. Meisner, William H. Barrett, McDermott, Will & Emery - Washington, Washington, DC; Joseph C. Smith, Jr., Barlit Beck Herman Palenchar & Scott, LLP - Denver, Denver, CO; Kevin M. Bolan, McDermott, Will & Emery - Boston, Boston, MA; Mickey T. Webster, Wyatt, W. Craig Robertson, III, Tarrant & Combs LLP - Lexington, Lexington, KY; Seth D. Greenstein, Constantine Cannon, PC, Washington, DC, US; William L. London, III, Static Control Components, Sanford, NC.

For Lexmark International, Inc., Counter Claimant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, [*5] Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem, NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

For NER Data Products, Inc., Counter Defendant: Andrew C. Oatway Morisi & Oatway, Quincy, MA; Jay Edward Ingle, Jackson & Kelly, Lexington, KY; Michael R. Reinemann, Thomas C. O'Konski, Cesari & McKenna, LLP, Boston, MA.

Pendl Companies, Inc., Counter Defendant: Daniel E. Danford, Elizabeth L. Thompson Stites & Harbison PLLC - Lexington, Lexington, KY; David H. Weber, Liebman, Conway, Olejniczak & Jerry, S.C., Green Bay, WI, US; Jack A. Wheat, Jennifer L. Kovalcik, Joel T. Beres, William Charles Ferrell, Jr., Stites & Harbison, PLLC - Louisville, Louisville, KY; James R. Michels, Stites & Harbison, PLLC - Nashville, Nashville TN, US; Michael Peter Foley, Rendigs, Fry, Kiely & Dennis, LLP, Cincinnati, OH.

For Wazana Brothers International, Inc., doing business as Micro Solutions Enterprises, Counter Defendant: A. Steven [*6] Dotan, Darren S. Enenstein, Geronimo Perez, Jr., Neb Gellhar, O. Andrew Wheaton, Stephen J. Rafferty, Moldo, Davidson, Fraioli, Seror & Sestanovich, LLP - LA, Los Angeles, CA; Andrew D. DeSimone, Douglas L. McSwain, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY; Elizabeth L. Swanson Swanson & Associates, Beverly Hills, CA, US; Steven P. Bogart, Reinhart, Boemer, Van Deuren, Milwaukee, WI.

For Static Control Components, Inc., Counter Defendant: Alison G. Wheeler, Bartlit Beck Herman Palenchar & Scott LLP, Denver, CO US; Allison W. Freedman, James B. Heaton, III, Barlit Beck Herman Palenchar & Scott, LLP - Chicago, Chicago, IL; John R. Fuisz, Melise R. Blakeslee, Paul E. Poirot, Stefan M. Meisner, William H. Barrett, McDermott, Will & Emery - Washington, Washington, DC; Joseph C. Smith, Jr., Barlit Beck Herman Palenchar & Scott, LLP - Denver, Denver, CO; Kevin M. Bolan, McDermott, Will & Emery - Boston, Boston, MA; Mickey T. Webster, Wyatt, W. Craig Robertson, III, Tarrant & Combs LLP - Lexington, Lexington, KY; Seth D. Greenstein, Constantine Cannon, PC, Washington, DC US; William L. London, III, Static Control Components, Sanford, NC.%

For Wazana Brothers International, [*7] Inc., Counter Claimant: A. Steven Dotan, Darren S. Enenstein, Geronimo Perez, Jr., Neb Gellhar, O. Andrew Wheaton, Stephen J. Rafferty, Moldo, Davidson, Fraioli, Seror & Sestanovich, LLP - LA, Los Angeles, CA; Andrew D. DeSimone, Douglas L. McSwain, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY; Elizabeth L. Swanson Swanson & Associates, Beverly Hills, CA US; Steven P. Bogart, Reinhart, Boemer, Van Deuren, Milwaukee, WI.

For Lexmark International, Inc., Counter Defendant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem,

NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

For Static Control Components, Inc., Cross Defendant: Alison G. Wheeler, Bartlit Beck Herman [*8] Palenchar & Scott LLP, Denver, CO US; Allison W. Freedman, James B. Heaton, III, Barlit Beck Herman Palenchar & Scott, LLP - Chicago, Chicago, IL; John R. Fuisz, Melise R. Blakeslee, Paul E. Poirot, Stefan M. Meisner, William H. Barrett, McDermott, Will & Emery - Washington, Washington, DC; Joseph C. Smith, Jr., Barlit Beck Herman Palenchar & Scott, LLP - Denver, Denver, CO; Kevin M. Bolan, McDermott, Will & Emery - Boston, Boston, MA; Mickey T. Webster, Wyatt, W. Craig Robertson, III, Tarrant & Combs LLP - Lexington, Lexington, KY; Seth D. Greenstein, Constantine Cannon, PC, Washington, DC US; William L. London, III, Static Control Components, Sanford, NC.

For NER Data Products, Inc., Counter Claimant: Jay Edward Ingle, Jackson & Kelly, Lexington, KY; Michael R. Reinemann, Thomas C. O'Konski, Cesari & McKenna, LLP, Boston, MA.

For Lexmark International, Inc., Counter Claimant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F. Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, [*9] Winston-Salem, NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, Steven Brian Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

Pendl Companies, Inc., Counter Claimant: David H. Weber, Liebman, Conway, Olejniczak & Jerry, S.C., Green Bay, WI US; James R. Michels, Stites & Harbison, PLLC - Nashville, Nashville TN; Michael Peter Foley, Rendigs, Fry, Kiely & Dennis, LLP, Cincinnati, OH.Joel T. Beres, William Charles Ferrell, Jr., Stites & Harbison, PLLC - Louisville, Louisville, KY.

For Lexmark International, Inc., Counter Claimant: Christopher B. Roth, Frederic M. Meeker, Joseph M. Potenza, Banner & Witcoff, LTD - DC, Washington, DC, US; Donald R. Esposito, Jr., Womble Carlyle Sandridge & Rice, Raleigh, NC; Hada V. Haulsee, John F.

Morrow, Jr., Mark N. Poovey, W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, PLLC - NC, Winston-Salem, NC; Mark T. Banner, Matthew P. Beeker, Binal J. Patel, Timothy C. Meece, Banner & Witcoff, LTD - IL, Chicago, IL; Charles E. Shivel, Jr., Hanly A. Ingram, [*10] Steven Brian Loy, Stoll Keenon Ogden, PLC-Lexington, Lexington KY; Christopher J. Renk, Jason S. Shull, Banner & Witcoff, Ltd., Chicago, IL.

**JUDGES:** JAMES B. TODD, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES B. TODD

**OPINION:**

### AMENDED MEMORANDUM OPINION AND ORDER

This matter is before the court on plaintiff's motion for clarification and/or reconsideration of the Memorandum Opinion and Order entered on March 31, 2006, which granted Lexmark's motion to compel discovery from plaintiff SCC. [DE # 275]. This motion has been fully briefed and is ripe for review.

SCC's motion to clarify and/or reconsider the Memorandum Opinion and Order of March 31, 2006, concerns numerical paragraph l.b. on page 12 thereof, which states:

> b. SCC is directed to produce those documents and communications relating to SCC's efforts to defeat Lexmark's Prebate program.

Memorandum Opinion and Order, p. 12 - DE # 266.

As grounds for its motion to clarify and/or reconsider the foregoing numerical paragraph 1 .b., SCC contends that said paragraph should be clarified and/or reconsidered "only to the extent it commands the production of privileged information." Memorandum in Support of Motion [*11] Clarification and/or Reconsideration of Memorandum Opinion and Order Dated March 31, 2006, p. 1 - DE # 275. Specifically, SCC argues that it should not be required to produce certain documents protected by the attorney/client privilege to Lexmark because (1) it has not waived the attorney/client privilege as to those particular documents, and (2) the Magistrate Judge erroneously concluded in the Memorandum Opinion and Order of March 31, 2006, that SCC had waived the attorney/client privilege as to all documents concerning Lexmark's Prebate program. Thus, SCC requests the

Magistrate Judge to clarify that it is not required to produce from the universe of documents relating to SCC's efforts to defeat Lexmark's Prebate program, any information that is protected by the attorney/client privilege.

Lexmark objects to SCC's motion to clarify and/or reconsider, asserting that due to the fact that SCC disclosed privileged communications to a third parties and placed its counsel's advice at issue, SCC has waived all attorney/client privilege and work product protections with respect to the subject matter of that advice, as seen in *In re Powerhouse Licensing, 441 F.3d 467 (6th Cir. 2006);* [*12] *In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289 (6th Cir. 2002); Fort James Corp. v. Solo Cup Co., 412 F.3d 1340 (Fed. Cir. 2005).* Elaborating, Lexmark points out that in 1998 SCC (1) widely disseminated to its customers a legal opinion that its General Counsel, Mr. London, obtained from an outside attorney, Mr. Walker Blakey, concerning the enforceability, validity, and general legality of Lexmark's Prebate program (*See* DE # 223, Exhibit D); and (2) made Mr. Blakey's legal opinion the focal point of SCC's declaratory judgment action filed against Lexmark in response to Lexmark's patent infringement claims (DE # 223, Exhibit I).

Additionally, Lexmark also argues that SCC waived its attorney/client and work product privileges by failing to assert those privileges in a privilege log that identifies the withheld documents. *See* Advisory Committee Notes to 1993 Amendments to *Fed.R.Civ.P. 26(b)(5); Peat, Marwick, Mitchell & Co. v. West, 748 F.2d 540, 542 (10th Cir. 1984).* Explaining this argument, Lexmark points out that SCC claimed that several documents relating [*13] to SCC's Anti-Prebate effort and/or Lexmark's Prebate program were protected by the attorney/client and work product privileges, but that SCC failed to *timely* identify those documents on its privilege log, as seen by the fact that subsequent to the March 31, 2006 Memorandum Opinion and Order in question, SCC produced an amended privilege log that belatedly identified 105 additional documents, nearly all of which are dated prior to 2002 and all of which are responsive to discovery requests that Lexmark served several years ago.

Furthermore, Lexmark submits that to the extent SCC's aforementioned conduct did not waive all attorney/client and work product privileges SCC may have had for documents relating to Lexmark's Prebate program, the remainder of any such privileges was waived when its General Counsel, Mr. London, testified during his deposition regarding SCC's legal opinions and the analysis underlying those opinions pertaining to Lexmark's Prebate program, as Mr. London openly revealed (1) the factual and legal basis for his opinions that Lexmark's Prebate agreement was invalid, unenforceable, and void, and (2) the legal conclusions reached by SCC's outside counsel regarding [*14] Lexmark's Prebate program. (*See* Lexmark's Opposition to SCC's Motion for Reconsideration and/or Clarification of Opinion and Order Dated March 31, 2006, Exhibit D (London Deposition, pp. 37-54).

Finally, Lexmark argues that the scope of the attorney/client and work product privilege waiver is not limited in time or to specific counsel and that the scope of this waiver extends to pre-suit and post-suit communications and to communications on the same subject matter between SCC and all other counsel, including trial counsel. *Akeva LLC v. Mizuno Corp., 243 F. Supp. 2d 418, 423 (M.D.N.C. 2003); McCormick-Morgan, Inc. v. Teledyne Industries, Inc., 765 F.Supp. 611,613-14 (N.D. Cal. 1991).*

In reply, SCC counters that it did not waive the attorney/client and work product privileges in respect to Lexmark's Prebate program by disclosing the Blakey Letter since the Blakey Letter was not a privileged communication, which is why SCC has never asserted a privilege to the Blakey Letter. SCC also argues that assuming *arguendo* that the Blakey Letter is a privileged communication, the broad waiver proposed by Lexmark is inappropriate and that any waiver of [*15] the attorney/client and work product privileges must be narrowly construed. SCC also argues that Mr. London's testimony did not waive the attorney/client or work product privilege. Further, SCC asserts that Lexmark's argument concerning SCC's Privilege Log ignores the obligation the parties have under the Federal Rules of Civil Procedure to supplement discovery responses.

**Analysis**

**A. Dissemination of the Blakey Letter**

In 1998, SCC widely disseminated to its customers a copy of a five-page letter dated September 8, 1998, from Mr. Walter Blakey, a contracts law professor at the University of North Carolina, addressed to William L. London, SCC's General Counsel, which expressed Mr. Blakey's opinions concerning the enforceability, validity, and general legality of Lexmark's Prebate program. This letter (hereafter "Blakey Letter") was written to Mr. London in response to his request to Mr. Blakey for an opinion on Lexmark's Prebate Program. The Blakey Letter (Bates-numbered document SCC-LEX 0668330 - 0668334), is captioned "Re: Abandoned "prebate" cartridges" and states in pertinent part, as follows:

> At your request I have reviewed the testimony of William Duffy, [*16] Vice President of Lexmark International, Inc., on April 22, 1998, at a Committee Hearing of the New York State Assembly on

Toner Cartridge Remanufacturing, examined copies of the box, labels, and package inserts used by Lexmark with its "prebate" cartridges, and researched the property and contract law applicable to the reuse of abandoned cartridges. All this has led me to the following conclusion. In my opinion, the Lexmark "prebate" Program does not create any legal barrier to the purchase and reuse by others of "prebate" cartridges which have been thrown away by the end-users.

This opinion does not deal with the application of either patent law or antitrust law to the Lexmark "prebate" program, but I see nothing in either area of law that would raise any questions about my conclusion. Indeed, there are doctrines in both areas of law that might well prevent the successful adoption by any manufacturer of a strong program to prevent the reuse of abandoned used cartridges. (See, e.g., *Morton Salt Co. v. G. S. Suppiger Co.*, *315 U.S. 488, 62 S. Ct. 402, 86 L. Ed. 363, 1942 Dec. Comm'r Pat. 733 (1942)*. However, this opinion deals only with American property and contract law.

Blakey [*17]  Letter, p. 1 (SCC-LEX 0668330).

A complete copy of the five-page Blakey Letter was attached to a letter dated September 11, 1998, that SCC's General Counsel, William L. London, sent to SCC's customers (hereafter "London Letter"), which discussed the Blakey Letter and stated in relevant part, as follows:

The most important part of his letter is the conclusion. "In any event, the present Lexmark Prebate Program does not create any legal barrier to the purchase and reuse by others of prebate cartridges that have been discarded by end-users." In other words, prebate cartridges which have been thrown away by the original purchaser may be remanufactured. This means, whatever the antitrust or patent implications of the Prebate Program may be, you can recover abandoned prebate cartridges and remanufacture them.

London Letter (SCC-LEX 0668328).

The Magistrate Judge remains unpersuaded by SCC's argument that the Blakey Letter was not a privileged communication and that therefore, there was no waiver of the attorney/client privilege by the subsequent disclosure of the Blakey Letter to SCC's customers. Since the Blakey Letter resulted from a request by SCC's General Counsel [*18]  to Blakey requesting his opinion as to the general legality of Lexmark's Prebate Program, the Magistrate Judge concludes that at the time it was rendered to Mr. London, SCC's General Counsel, it was a privileged communication to SCC. Based on the opinion contained in the Blakey Letter, SCC decided to disseminate the Blakey Letter to its customers, since Mr. Blakey expressed an opinion that Lexmark's Prebate program was legally unenforceable.

However, SCC's public disclosure of the Blakey Letter did not end there. Shortly after disseminating the Blakey Letter to its customers, SCC filed a declaratory judgment action against Lexmark alleging that SCC did not infringe Lexmark's patents because Lexmark's Prebate program was invalid and unenforceable. The Blakey Letter was the focal point of SCC's declaratory judgment action:

The claim for declaratory judgment arises from a real controversy between Static Control and Lexmark over whether Static Control's dissemination of an opinion letter authored by a University of North Carolina law professor constitutes inducement of infringement or contributory infringement of Lexmark's purported patent rights.

*See* Docket Entry [*19]  # 223, Exhibit I, P 3.

At Static Control's request, Professor Blakey reviewed the Lexmark Prebate scheme and researched relevant legal considerations. Professor Blakey concluded that the Lexmark Prebate scheme does not create any legal barrier to the purchase and reuse by others of Prebate cartridges which have been thrown away by the end users.

*Id.* at P 15.

SCC insists that the Blakey Letter was not privileged because "Mr. Blakey was not engaged to provide legal advice." However, this argument is belied by the plain

language contained in the Blakey Letter. To reiterate, Mr. Blakey stated in the Blakey Letter:

> At your request I have reviewed . . . , examined . . ., and researched the property and contract law applicable to the reuse of abandoned cartridges. All this has led me to the following conclusion. In my opinion, the Lexmark "prebate" Program does not create any legal barrier to the purchase and reuse by others of "prebate" cartridges which have been thrown away by the end-users.

Blakey Letter, p. 1 (SCC-LEX 0668330).

Additionally, Mr. London, in his subsequent letter to SCC's customers, states:

> I have asked Professor Walker [*20] Blakey . . . to review the Prebate Program and render his opinion . . . Enclosed is a copy of his letter to me.

London Letter (SCC-LEX 0668328).

Consequently, based on the fact that SCC requested a legal opinion from Mr. Blakey concerning the legality of Lexmark's Prebate program, it is clear to the Magistrate Judge that Mr. Blakey's opinion contained in the Blakey Letter was a privileged communication to SCC, irrespective of the fact that SCC is now trying to label the Blakey Letter as a non-privileged communication. A rose by any other name smells the same. SCC waived its attorney/client and work product privileges relating to the subject matter of the Blakey Letter when it (1) disseminated the Blakey Letter to its customers, and (2) placed the legal opinion of Mr. Blakey contained in the Blakey Letter at issue in the declaratory judgment action SCC filed in 1998 in response to Lexmark's claims of patent infringement.

In this particular instance, SCC is attempting to use the attorney/client privilege as both a shield and a sword by disclosing to Lexmark the documents that are favorable to its position and by withholding other documents, under the protection afforded [*21] by the attorney/client privilege, that are unfavorable to its position. "The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own

benefit." *Permian Corp. v. United States, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981)*.

The Magistrate Judge is also unpersuaded by SCC's argument that it should not be deemed to have waived the attorney/client privilege for all documents concerning Lexmark's Prebate program simply because it disclosed some documents that were protected by the attorney/client privilege. As seen in *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation, supra,* the Sixth Circuit rejected a similar selective waiver argument. "However, after due consideration, we reject the concept of selective waiver, in any of its various forms." *Columbia/HCA Healthcare, 293 F.3d at 302*. Elaborating on the rationale underlying the Sixth Circuit's rejection of "selective waiver," the Sixth Circuit in *Columbia/HCA Healthcare* [*22] stated:

> . . . Just as the attorney-client privilege itself provides certainty to litigants that information relayed to one's attorney will not be disclosed, rejection of selective waiver provides further certainty that waiver of the privilege ensures that the information will be disclosed.

*Id. at 304*.

For all of the foregoing reasons, SCC's selective waiver argument does not carry the day. The Magistrate Judge again concludes that SCC has waived the attorney/client and work product privileges for all documents pertaining to Lexmark's Prebate program.

**B. Privilege log**

SCC further argues that the fact that it recently provided Lexmark with an amended or supplemented privilege log should not be deemed to have waived the attorney/client and/or work product privileges, since it was merely complying with the Federal Rules of Civil Procedure and supplementing its discovery responses as it is required to do under the civil rules.

Having concluded again, for the reasons stated above, that SCC has waived the attorney/client and work privileges for all documents relative to Lexmark's Prebate program based on the disclosure of the Blakey Letter and [*23] the London Letter to its clients, the Magistrate Judge need not consider the merits of SCC's argument concerning the supplementation of its privilege log.

Accordingly, **IT IS HEREBY ORDERED** that:

2006 U.S. Dist. LEXIS 40612, *

1. Plaintiff SCC's motion for clarification and/or reconsideration of the Memorandum Opinion and Order entered on March 31, 2006 [DE # 275] is **GRANTED.**

2. Upon reconsideration of numerical paragraph 1.b. on page 12 of the Memorandum Opinion and Order of March 31, 2006, the Magistrate Judge reaffirms said paragraph and clarifies that SCC is directed to produce *all documents,* both privileged and non-privileged, relating to SCC's efforts to defeat Lexmark's Prebate program.

3. SCC is given twenty (20) days from the date of this Order in which to supplement its discovery responses in compliance with this Memorandum Opinion and Order.

This 15th day of June, 2006.

JAMES B. TODD
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CASE NO. 04-456-KSF

STATIC CONTROL COMPONENTS, INC.                                    PLAINTIFF

v.              **LEXMARK'S FIRST SET OF REQUESTS
                FOR DOCUMENTS AND THINGS TO PENDL (1-94)**

LEXMARK INTERNATIONAL, INC.                              DEFENDANT

v.

WAZANA BROTHERS INTERNATIONAL, INC.
d/b/a MICRO SOLUTIONS ENTERPRISES              COUNTERCLAIM DEFENDANT

v.

PENDL COMPANIES, INC.                          COUNTERCLAIM DEFENDANT

v.

NER DATA PRODUCTS, INC.                        COUNTERCLAIM DEFENDANT

*** *** *** *** *** *** *** *** ***

Defendant and Counterclaim Plaintiff Lexmark International, Inc. ("Lexmark") by counsel, hereby submits to Counterclaim Defendant Pendl Companies, Inc. ("Pendl") the following First Set of Requests for Production of Documents and Things, to be responded to in accordance with Federal Rules of Civil Procedure 26 and 34. Pendl shall produce for inspection and copying the documents and things responsive to these requests at the office of Banner & Witcoff. Ltd., 10 South Wacker Drive, Suite 3000, Chicago, Illinois 60606.

**Request No. 46:**  Please produce all documents and things relating to oral or written opinions, investigations or analyses regarding the validity, enforceability or infringement of the Lexmark Patents.

**Request No. 47:**  Please produce all documents and things that were made available to, referred to or used by persons in generating oral or written opinions, or performing any investigations or analyses, regarding the validity, enforceability or infringement of the Lexmark Patents.

**Request No. 48:**  Please produce all documents and things relating to Pendl's reliance, if any, on the advice or opinion of counsel as a defense to the charge of willful infringement.

**Request No. 49:**  Please produce all documents and things, including but not limited to patents, printed publications, toner cartridges and components, that Pendl contends may be relevant prior art with respect to the subject matter of the claims of the Lexmark Patents.

**Request No. 50:**  Please produce all documents and things that relate to, refute or support Pendl's contention that a document or thing produced in response to the preceding request is prior art, including but not limited to evidence of publication, public use or sale of the document or thing contended to be relevant prior art.

**Request No. 51:**  Please produce all documents and things that Pendl contends has an effect on the validity or enforceability of the claims of the Lexmark Patents.

**Request No. 93:**  Please produce all documents and things referring or relating to contracts or agreements with SCC, Pendl, NER, IPW or other entities for the sale of microchips for use with Lexmark's Printers.

**Request No. 94:**  Please produce all pleadings and deposition transcripts from all civil actions in which Pendl has been a party concerning laser printers, toner cartridges for laser printers, or microchips for use with toner cartridges.

Respectfully submitted,

Dated: August 25, 2005

By: _____

Charles E. Shivel, Jr.
Steven B. Loy
Hanly A. Ingram
STOLL, KEENON & PARK LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507
Telephone: (859) 231-3000
Facsimile: (859) 253 1093

Joseph M. Potenza
BANNER & WITCOFF, LTD.
1001 G Street, N.W., 11th Floor
Washington, DC  20001
Telephone:  (202) 508-9100
Facsimile:  (202) 508-9299

Christopher J. Renk
Timothy C. Meece
Binal J. Patel
Jason S. Shull
BANNER & WITCOFF, LTD.
10 S. Wacker Drive, Suite 3000
Chicago, IL  60606
Telephone:  (312) 715-1000
Facsimile:  (312) 715-1234

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CASE NO. 04-456-KSF

STATIC CONTROL COMPONENTS, INC.                          PLAINTIFF

v.          **RESPONSE TO LEXMARK'S FIRST SET OF REQUESTS
FOR DOCUMENTS AND THINGS TO PENDL (1-94)**

LEXMARK INTERNATIONAL, INC.                              DEFENDANT

v.

WAZANA BROTHERS INTERNATIONAL, INC.          COUNTERCLAIM DEFENDANT
d/b/a MICRO SOLUTIONS ENTERPRISES

v.

PENDL COMPANIES, INC.                        COUNTERCLAIM DEFENDANT
v.

NER DATA PRODUCTS, INC.                      COUNTERCLAIM DEFENDANT

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

Counterclaim Defendant Pendl Companies, Inc. ("Pendl") by counsel, hereby submits its

objections and responses to the first set of requests for production propounded by Defendant and

Counterclaimant Lexmark International, Inc. ("Lexmark").

## GENERAL OBJECTIONS

1.      Pendl provides these objections and responses according to the Federal Rules of

Civil Procedure.  Pendl does not hereby waive any rights or objections or admit the authenticity,

relevance, materiality, or admissibility into evidence of the subject mater or facts in any

discovery request or Pendl response, including any documents which may be provided as part of

such response.  Pendl specifically reserves:  (a) the right to object to the uses of such responses,

or the subject matter thereof, on any ground in any further proceeding in this action; and (b) its

**RESPONSE:** OBJECTION.  In addition to the incorporated General Objections and Objections to Definitions and Instructions, Pendl specifically objects to this request because it is overbroad and unduly burdensome, seeks information that is protected by attorney-client privilege or the work product doctrine, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, namely information about technology that is not at issue in this dispute between Lexmark and Pendl.  Pendl further objects to the extent this request seeks information duplicative of Request Nos. 40, 42, 43, 44, 45, and 46, and Pendl incorporates its objections thereto as if stated here in full.  Pendl further objects to the extent Lexmark has not identified which of the 23 patents that comprise "Lexmark Patents" as currently defined or which, if any, of the claims of those patents are claimed by Lexmark to be infringed by Pendl, thus making this request overly broad and burdensome.  Pendl states that to the extent that there are relevant, non-privileged, responsive documents and things that have not already been produced to Lexmark, Pendl will permit inspection and copying of those documents subject to Pendl's objections.

**REQUEST NO. 48:**  Please produce all documents and things relating to Pendl's reliance, if any, on the advice or opinion of counsel as a defense to the charge of willful infringement.

**RESPONSE:** OBJECTION.  In addition to the incorporated General Objections and Objections to Definitions and Instructions, Pendl specifically objects to this request because it is overbroad and unduly burdensome, seeks information that is protected by attorney-client privilege or the work product doctrine, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, namely information about technology that is not at issue in this dispute between Lexmark and Pendl.  Pendl further objects to the extent Lexmark

has not identified which of the 23 patents that comprise "Lexmark Patents" as currently defined or which, if any, of the claims of those patents are claimed by Lexmark to be infringed by Pendl, thus making this request overly broad and burdensome. Pendl states that to the extent that there are relevant, non-privileged, responsive documents and things that have not already been produced to Lexmark, Pendl will permit inspection and copying of those documents subject to Pendl's objections.

**REQUEST NO. 49:**  Please produce all documents and things, including but not limited to patents, printed publications, toner cartridges and components, that Pendl contends may be relevant prior art with respect to the subject matter of the claims of the Lexmark Patents.

**RESPONSE:** OBJECTION.  In addition to the incorporated General Objections and Objections to Definitions and Instructions, Pendl specifically objects to this request because it is overbroad and unduly burdensome, seeks information that is protected by attorney-client privilege or the work product doctrine, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, namely information about technology that is not at issue in this dispute between Lexmark and Pendl.  Pendl further objects to the extent Lexmark has not identified which of the 23 patents that comprise "Lexmark Patents" as currently defined or which, if any, of the claims of those patents are claimed by Lexmark to be infringed by Pendl, thus making this request overly broad and burdensome.  Pendl states that to the extent that there are relevant, non-privileged, responsive documents and things that have not already been produced to Lexmark, Pendl will permit inspection and copying of those documents subject to Pendl's objections.

**REQUEST NO. 50:**  Please produce all documents and things that relate to, refute or support Pendl's contention that a document or thing produced in response to the preceding

produced to Lexmark, Pendl will permit inspection and copying of those documents subject to Pendl's objections.

**REQUEST NO. 94:**  Please produce all pleadings and deposition transcripts from all civil actions in which Pendl has been a party concerning laser printers, toner cartridges for laser printers, or microchips for use with toner cartridges.

**RESPONSE:** OBJECTION.  In addition to the incorporated General Objections and Objections to Definitions and Instructions, Pendl specifically objects to this request because it is overbroad and unduly burdensome, seeks information that may be protected by confidentiality, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, namely information about technology that is not at issue in this dispute between Lexmark and Pendl.  Pendl reiterates its concerns set forth in its Motion for More Definite Statement and asks Lexmark to state which specific patents and patent claims Lexmark alleges are infringed by Pendl.  Pendl states that to the extent that there are relevant, non-privileged, responsive documents and things that have not already been produced to Lexmark, Pendl will permit inspection and copying of those documents subject to Pendl's objections.

Joel T. Beres
Jack A. Wheat
Jennifer L. Kovalcik
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY  40202-3352
Telephone: (502) 587-3400
COUNSEL FOR PENDL COMPANIES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by United States First Class Mail, postage prepaid, on this 31st day of October, 2005 upon:

Charles F. Shivel, Jr.
Steven B. Loy
Hanly A. Ingram
STOLL, KEENON & PARK LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507

W. Craig Robertson III
Mickey T. Webster
Wyatt, Tarrant & Combs, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507

Joseph M. Potenza
BANNER & WITCOFF, LTD.
1001 G Stret, N. W. 11th Floor
Washington, DC 20001

William L. London
Static Control Components, Inc.
3010 Lee Avenue, P.O. Box 152
Sanford, North Carolina 27331

Christopher J. Renk
Timothy C. Meece
Binal J. Patel
Jason S. Shull
BANNER & WITCOFF, LTD.
10 S. Wacker Drive, Suite 3000
Chicago, IL 60606

Patrick W. Michael
Woodward Hobson &
Fulton, LLP
2500 National City Tower
Louisville, KY 40202

David A. Shirlen
Mark N. Poovey
John F. Morrow, Jr.
WOMBLE CARLYLE SANDRIDGE AND
RICE PLLC
One West Fourth Street
Winston-Salem, NC 27101

Seth D. Greenstein
William H. Barrett
Melise R. Blakeslee
John R. Fuisz
Stefan M. Meisner
Ann M. Brose
McDermott, Will & Emery
600 13th Street, N.W.
Washington, D.C. 20005-3096

Darren S. Enenstein
Steven Dotan
Moldo Davidson Fraioli
Seror & Sestanovich, LLP
1925 Century Park East
16th Floor
Los Angeles, CA 90067

Thomas C. O'Konski
Michael R. Reinemann
Cesari & McKenna, LLP
88 Black Falcon Avenue
Boston, Massachusetts 02210

One of Counsel for Pendl Companies, Inc.

# EXHIBIT D



TEN SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, ILLINOIS 60606-7407

TEL: 312.463.5000
FAX: 312.463.5001
www.bannerwitcoff.com

MATTHEW P. BECKER
mbecker@bannerwitcoff.com

October 6, 2006

<u>**VIA FASCIMILE: 502.587.6391**</u>

Joel T. Beres
James R. ("Randy") Michels
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352

Re:     *Lexmark International, Inc. v. Static Control Components, Inc.*
          **Case No. 04-84-KSF (consolidated with No. 02-571)**

Dear Joel:

Lexmark's Request for Production No. 48 to Pendl requested: "all documents and things relating to Pendl's reliance, if any, on the advice of counsel as a defense to the charge of willful infringement." In its October 31, 2005, Responses to Lexmark's First Set of Requests for Production, Pendl objected to this Request No. 48 stating, *inter alia,* that this request sought documents that are protected from discovery by the attorney-client privilege and/or work product doctrine.

With only approximately 40 days left in discovery, it is time for Pendl to decide whether or not it will assert the advice of counsel defense so that Lexmark may take whatever follow-up discovery is necessary related to this defense, if asserted. Accordingly, please state by Tuesday, October 10, 2006, whether Pendl is relying on the advice of counsel to defend against Lexmark's charge of willful infringement.

As you know, should Pendl assert or rely on the advice of counsel defense that results in a waiver of attorney-client privilege and work-product protection. *See In re Echostar Communications Corp.*, 448 F.3d 1294 (Fed. Cir. 2006). Accordingly, if Pendl is asserting an advice of counsel defense, Pendl please produce all responsive documents withheld from Request No. 48 by Friday, October 13.

CHICAGO, IL

WASHINGTON, DC

BOSTON, MA

PORTLAND, OR

Joel T. Beres
James R. ("Randy") Michels
October 6, 2006
Page 2


     Should Pendl fail to inform Lexmark by Tuesday regarding whether it is or is not asserting the advice of counsel defense, we will assume Pendl that refuses to inform Lexmark of its decision and we will need to schedule a conference with Magistrate Judge Todd.


                                    Very truly yours,

                                    Matthew P. Becker

MPB/cmf

**EXHIBIT E**

**From:** Binal Patel
**Sent:** Friday, October 13, 2006 2:43 PM
**To:** jberes@stites.com; JKovalcik@stites.com
**Cc:** Matt Becker
**Subject:** Static Control v. Lexmark -- Advice of Counsel Defense

Joel,

Thank you for your response.  In addition to the opinion of counsel itself, we expect that you will immediately produce all previously withheld documents that would be deemed waived under In re Echostar, 448 F.3d 1294 (Fed. Cir. 2006) as well as the attached recent Order in Outside Box Innovations v. Travel Caddy, Inc. (Oct. 6, 2006 N.D. Ga).  Moreover, please let us know when we can depose the author(s) and recipient(s) of the opinion.  Finally, please provide a revised privilege log and identify those documents that are now being produced that were once logged as being privileged.


Regards,
Binal

Binal J. Patel
BANNER & WITCOFF, LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel: (312) 463-5000
Fax: (312) 463-5001
E-mail: bpatel@bannerwitcoff.com
www.bannerwitcoff.com

IMPORTANT/CONFIDENTIAL:  This message is intended only for the use of the individual or entity to whom it is addressed.  This message contains information from the law firm of Banner & Witcoff, LTD. which may be privileged, confidential, or exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, retention, archiving, or copying of the communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by reply E-mail.

   -----Original Message-----
From:  Beres, Joel [mailto:JBeres@stites.com]
Sent:  Thu Oct 12 21:41:23 2006
To:   Matt Becker
Subject:    Static Control v. Lexmark -- Advice of Counsel Defense

Matt,

Sorry for the delay in getting back with you; but I am on the road (again).  We carefully considered your request regarding Pendl's assertion of the advice of counsel defense.  Please be advised that Pendl will be relying at trial on advice of counsel as one of its defenses to Lexmark's claim of willful patent infringement.  In addition to all other documents previously produced in this matter, we will also produce to you a copy of the opinion of counsel tomorrow as requested in your recent letter.

Joel T. Beres

Direct Dial:  502-681-0324

Direct Fax:  502-779-8335

Mobile:  502-500-2029

jberes@stites.com

Stites & Harbison

Suite 1800

400 West Market Street

Louisville, Kentucky  40202-3352

Main:  502-587-3400

Main Fax:  502-587-6391

NOTICE: This message is intended only for the addressee and may contain information that is privileged, confidential and/or attorney work product. If you are not the intended recipient, do not read, copy, retain or disseminate this message or any attachment. If you have received this message in error, please call the sender immediately at (502) 587-3400 and delete all copies of the message and any attachment. Neither the transmission of this message or any attachment, nor any error in transmission or misdelivery shall constitute waiver of any applicable legal privilege.

# EXHIBIT F

# CONFIDENTIAL DOCUMENT
# FILED UNDER SEAL

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Union Pacific Resources Co. v. Natural Gas
Pipeline Co. of AmericaN.D.Ill.,1991.Only the
Westlaw citation is currently available.
  United States District Court, N.D. Illinois, Eastern
Division.
UNION PACIFIC RESOURCES COMPANY,
Plaintiff,
v.
NATURAL GAS PIPELINE COMPANY OF
AMERICA, Defendant.
**No. 90 C 5378.**

June 10, 1991.

*MEMORANDUM ORDER*
EDWARD A. BOBRICK, United States Magistrate
Judge.
**\*1** Before the court are two motions of
defendant-counterplaintiff Natural Gas Pipeline
Company of America ("Natural") to compel
plaintiff-counterdefendant Union Pacific Resources
Company ("UPR") to comply with certain
discovery requests. Each motion is directed toward
a different category of discovery request. UPR
maintains the attorney-client privilege precludes
discovery as to both categories of requests. Natural
argues that for reasons involving both UPR's actions
in this case and in another case six years ago, UPR
has waived the privilege as to both categories of
discovery requests. In assessing the parties'
positions, we begin with an overview of the events
leading up to the present litigation.

## I. BACKGROUND

The dispute presently before the court is ten years in
the making, and merits a bit more discussion of its
history than the parties have provided. *See, Colo.
Interstate Gas v. Natural Gas Pipeline Co.,* 661
F.Supp. 1448 (D.Wyo.1987). It stems back to

certain contracts amongst Natural, UPR, and
Colorado Interstate Gas ("CIG"), involving the
sales and transportation of Natural Gas in the early
1980's. Natural is, and was during the period at
issue, involved in the business of transporting
natural gas. UPR is the corporate successor of the
Champlin Petroleum Company ("Champlin"),
which was involved in the production and sale of
natural gas during the period at issue; UPR remains
in that industry to this day. The third participant in
this natural gas triangle, CIG, was Natural's
competitor in the gas transportation business during
the period at issue.

### A. *The Wyoming Natural Gas Contracts*

In 1982, Natural and CIG were parties to a contract
obligating CIG to deliver, and requiring Natural to
purchase, specified quantities of natural gas. The
contract required CIG to maintain adequate reserves
and transportation capacity to ensure delivery of the
natural gas to which Natural was entitled. For its
part, Natural was required to purchase a minimum
daily volume of natural gas or pay the costs of
volumes not taken. During this time, Champlin
was one of CIG's suppliers, producing natural gas
out of the Whitney Canyon and Overthrust regions
of Wyoming.

At about the same time, a new natural gas pipeline,
the Trailblazer System, was constructed to transport
natural gas out of the Overthrust region. Natural
had major financial and capacity interests in the
Trailblazer System, which it owned with two other
companies, and apparently operated its interest
through a company called NGPL-Trailblazer. The
Trailblazer System competed with CIG's pipeline
for the transportation of natural gas from the
Overthrust region, but as a new pipeline, it had to
charge a somewhat higher transportation rate.

In July of 1983, Natural refused to accept natural
gas from CIG.[FN1] Nevertheless, CIG was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 2

Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

obligated under the Natural Gas Act to remain ready to deliver any volume of natural gas Natural requested. Thus, CIG could not use its pipeline capacity reserved for Natural to transport natural gas to other customers. As a further consequence, CIG was unable to purchase natural gas from its own suppliers, and it "shut-in" natural gas that Champlin owned in the Whitney Canyon region. Champlin responded by suing CIG for breach of contract. Champlin's lawsuit was settled after extensive negotiations in 1983, part of which resulted in CIG releasing its rights to purchase Champlin's Whitney Canyon natural gas. Thereafter, Champlin agreed to sell that natural gas to Natural, and it was shipped through the Trailblazer System.

### B. *The CIG Case*

**\*2** CIG then brought its action against Natural, alleging that Natural had attempted to monopolize the market for transportation of Wyoming natural gas, that it had breached the agreement it had with CIG, and that it had tortiously interfered with CIG's contract relationship with Champlin. Natural filed a counterclaim against CIG, alleging that it was CIG's parent corporation that had attempted to monopolize the market. Prior to trial, CIG won directed verdicts on portions of Natural's counterclaims and abandoned the conspiracy portion of its own monopoly claim. The jury then rejected the remainder of Natural's counterclaims and found for CIG on its breach, monopoly, and tortious interference claims in the total amount of nearly $725,000,000.00. Finding some of the damages duplicative, the court reduced the award to nearly $550,000,000.00 and later granted Natural a remittitur in the amount of $197,181,678.00. On appeal, the Tenth Circuit reversed only the anti-trust portion of the judgment against Natural, finding that CIG could not establish that, as a matter of law, there was a dangerous probability that the Trailblazer System would ever achieve a monopoly interest in the relevant market.

### C. *The Instant Case*

In the present case, UPR, Champlin's successor, brings two claims against Natural, essentially based on the foregoing circumstances. First, UPR alleges that Natural attempted to acquire a monopoly over the long-distance transportation of natural gas from the Overthrust area of Wyoming. (Amended Complaint, ¶ 38). Second, UPR claims that Natural tortiously interfered with UPR's contract with CIG. (Amended Complaint, ¶¶ 45-46). Currently pending before Judge Nordberg [FN2] is UPR's motion for partial summary on certain issues relating to the tortious interference portion of its claims. In that motion, UPR essentially argues that Natural should be precluded from relitigated issues relating to its tortious interference with UPR/CIG contract relationship as that question as decided against Natural in the CIG case. Obviously, the instant discovery dispute arises out of both of UPR's claims, but it is intimately related, at least in part, to UPR's motion for partial summary judgment.

### II. *THE INSTANT DISCOVERY DISPUTE*

Natural has filed two motions to compel discovery in this case, each relating to a separate category of discovery requests. As to both categories, UPR maintains the requested documents or information are protected by the attorney-client privilege. In one motion, Natural seeks documents which were authorized by or directed to attorneys of UPR relating to the negotiations UPR conducted with CIG and Natural in 1983. Natural argues that UPR waived any privilege that might apply to these documents by its release of documents regarding the subject matter pursuant to subpoena in 1985 as part of the CIG case. UPR counters by arguing that the documents produced in 1985 were not privileged in the first place and that it has not waived but consistently maintained the privilege as to the documents it now withholds.

**\*3** In its other motion, Natural seeks to compel refused discovery-which includes the production of documents, answers to interrogatories and answers to depositions-on the reason why UPR chose not to intervene in the CIG case. Natural argues that UPR can only avail itself of the collateral estoppel theory raised in its motion for partial summary judgment if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

it can show that it could not have easily joined in the CIG case. According to Natural, UPR has indicated during discovery that it did not intervene in the CIG case on the advice of counsel. Natural contends that by injecting the advice of counsel into the issue, UPR has waived the privilege as to the substance of such advice. UPR counters that it has not injected the issue of advice of counsel into these proceedings and that discovery into the substance of any such advice is unnecessary to determine whether it could have easily joined in the CIG case. In addition, UPR seeks to distinguish its refusal to answer questions on the grounds of attorney-client privilege from reliance on the defense of advice of counsel, which is the characterization which Natural attributes to UPR's refusals. We address each of the waiver issues Natural's motions raise in turn.

### A. *The 1985 Production Wavier*

The parties' dispute over the first category of discovery requests-documents relating to the early 1980's negotiations UPR conducted with CIG and Natural-centers around UPR's production of certain documents pursuant to subpoena in the CIG case in 1985. UPR apparently produced sixty-nine documents on January 30, 1985, pursuant to subpoena at that time. These documents were either authored by or directed to attorneys for UPR at that time. According to UPR, those documents were produced with the following proviso: "As you will note during the course of your review, we have produced many documents which were prepared by or for attorneys and [we] believe we have been very careful not to extend our claim beyond those documents which we feel are clearly privileged." (UPR's Memorandum in Opposition/1985 Document Production, at 1). Based on this proviso, UPR argues that the documents produced in 1985 were not privileged, and that UPR's production of those documents, therefore, does not waive the attorney-client privilege it now asserts as to the documents Natural seeks. UPR makes this argument despite the fact that it labeled those sixty-nine documents as privileged in the index it produced pursuant to court order on April 1, 1991. UPR indicates that its assertion of the attorney-client privilege with respect to those

sixty-nine documents was inadvertent due to the pressure it was under to produce the index. Essentially then, UPR's argument is that because it does not now, and did not in 1985, assert the attorney-client privilege as to the sixty-nine documents, its production of those documents in 1985 does not amount to a waiver of the attorney-client privilege as to any documents it presently withholds from discovery that cover the same subject matter. Although this is a clever tactic, we must reject UPR's argument and find that it has waived the attorney-client privilege as to all documents on the same subject matter as those produced in 1985.

**\*4** UPR's argument confuses the existence or availability of the attorney-client privilege with the assertion of that privilege. As a general matter, the attorney-client privilege exists to encourage clients to make the fullest disclosure to their attorneys, and accomplishes this end by protecting confidential communications between client and attorney. *Matter of Grand Jury Proceeding, Cherney,* 898 F.2d 565, 567 (7th Cir.1990). Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the confidential nature of the attorney-client relationship and thus waives the privilege. *Powers v. Chicago Transit Authority,* 890 F.2d 1355, 1359 (7th Cir.1989). The existence of the attorney-client privilege, then, stems from the nature of the attorney-client relationship and the communication within that relationship. It does not arise, as UPR would have, merely by a party's decision to apply it to particular communications. A party's invocation of the privilege as to some communications and not others does not have the talismanic affect of rendering those communications privileged or not. It is the party's choice whether to assert the privilege. In 1985, UPR clearly chose to assert the privilege as to some documents and waive it as to others. It cannot now argue that the documents it produced in 1985 were not privileged because it chose not to assert the privilege at that time.[FN3]

As a general rule, the voluntary disclosure of attorney-client communication constitutes a waiver of the privilege as to all other such communications on the same subject. *In Re Sealed Case,* 676 F.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4

Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

793, 809 (D.C.Cir.1982); *In Re Intern. Harvester's Disp. of Wis. Steel Lit.,* 666 F.Supp. 1148, 1153 (N.D.Ill.1987). Even though UPR made the 1985 production pursuant to subpoena, because UPR sought no claim of confidentiality for the documents produced, its production of those documents is considered voluntary. *Maryville Academy v. Loeb Rhoades & Co., Inc.,* 559 F.Supp. 7, 8 (N.D.Ill.1982). Further, given the relatedness of the instant case to the CIG case, this situation is not unlike a case where a party makes selective disclosure to gain an advantage in litigation, despite the fact that UPR's disclosure was not to an opposing litigant. *See Intern. Harvester,* 666 F.Supp. at 1153, 1157. The circumstances of UPR's 1985 disclosure dictate that it has waived the attorney-client privilege as to not only the documents it produced in 1985, but as to all others on the same subject matter, namely negotiations with CIG and Natural in the early 1980's. Accordingly, the motion of Natural to compel production of those documents is granted.[FN4]

### B. *The Collateral Estoppel Motion Waiver*

The parties' dispute over the second category of discovery requests stems from UPR's motion for partial summary judgment in this case, which it brings under an offensive collateral estoppel theory. Under that theory, of which the Supreme Court approved in *Parklane Hosiery Co., v. Shore,* a plaintiff may "estop a defendant from relitigating issues which the defendant previously litigated and lost in another proceeding." 439 U.S. 322, 329, 99 S.Ct. 645, 650 (1979). In this case, UPR seeks to prevent Natural from relitigating certain issues relating to Natural's tortious interference with the contract between UPR and CIG, on which Natural lost in the CIG case. In order to prevail on this motion, UPR must establish: (1) that Natural was a party, or in privity with a party, in the CIG case, (2) the issues in question were actually litigated and decided on the merits in the CIG case, (3) the resolution of those issues was necessary to the court's judgment, and (4) those issues are identical to the ones UPR raises in this case. *General Dynamics Corp. v. American Tel. & Tel. Co.,* 650 F.Supp. 1274, 1281 (N.D.Ill.1986); *citing*

*Falconer v. Meehan,* 884 F.2d 72 (7th Cir.1986). In addition to determining whether these familiar collateral estoppel requirements are present, the court will have to consider two additional questions: (1) whether the application of offensive collateral estoppel will be unfair to Natural, and (2) whether the application of offensive collateral estoppel will promote judicial economy. *Parkland Hosiery,* 439 U.S. at 329-331, 99 S.Ct. at 650-651. The Supreme Court granted trial courts broad discretion to apply offensive collateral estoppel, but indicated that it should not be applied when it would result in unfairness to the defendant or thwart judicial economy. *Id.* at 331, 99 S.Ct. at 651-682. In the instant case, it is the judicial economy factor that gives rise to the dispute over the second category of discovery requests.

**\*5** In *Parklane Hosiery,* the Supreme Court noted that, while *defensive* collateral estoppel often promotes judicial economy, *offensive* collateral estoppel may not. 439 U.S. at 329, 99 S.Ct. at 650-651. Specifically, the court observed that:

defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

*Id.* at 329-330, 99 S.Ct. at 650-651 (*citations omitted* ). Given these concerns, the Court found that, "in cases where a plaintiff could easily have joined in the earlier action .. a trial judge should not allow the use of offensive collateral estoppel." *Id.* at 331, 99 S.Ct. at 652. Accordingly, the court will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have to determine whether UPR could "easily have joined" in the CIG case in order to rule on its motion for partial summary judgment. It is this question which fuels the instant discovery dispute.

As is often the case, the parties here have apparently become far more embroiled in peripheral discovery battles than in the case itself. Natural insists that, when it asks why UPR sat out the CIG case, UPR answers that it did so on advice of counsel. As such Natural contends that, because UPR has injected the subject of advice of counsel into these proceedings, it has waived any privilege it might assert to shield the substance of that advice from discovery. UPR maintains that it has not injected advice of counsel into these proceedings and has never indicated that it intends to rely on the "advice of counsel" argument on the question of why it sat out the CIG case. Given that this is the third case to be filed based on the early 1980's Natural-UPR-CIG natural gas triangle, that it has been ten years in the making, and has already involved the production of thousands of documents in discovery, we will impose the following "compromise" on the parties, rather than conduct a trial on this issue and make an even bigger mountain out of the sizeable mountain which already exists.

When the holder of a privilege relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications, the holder is said to have waived that privilege. *Lorenz v. Valley Forge Ins. Co.,* 815 F.2d 1095, 1098 (7th Cir.1987). To waive the privilege in this manner, the holder must inject a new factual or legal issue into the case. *Id.* Because UPR's motion for partial summary judgment is an embryonic stage at this point, it is difficult to determine whether UPR has waived the privilege. Clearly, by filing the motion, UPR has injected the issue of whether it could have easily joined in the CIG case into these proceedings. It is unclear, however, that UPR will rely on "advice of counsel" as its reason for sitting out that previous litigation; thus, this court is reluctant to find a waiver at this time. It may well be that UPR will be able to make its case without resort to use of reliance on the advice of counsel. *See Intern.*

*Harvester,* 666 F.Supp. at 1951. Consequently, we find that UPR has not waived the privilege as to this second category of discovery requests. In so doing, we accept UPR's rather strenuous protestations that it has no intention of using "advice of counsel" as its reason for sitting out the CIG case. In fact, as assurance to Natural, we find that UPR has waived this argument in the context of its motion for partial summary judgment and will have to resort to other explanations of its choice to not join in the CIG case. Given this proviso, then, Natural's motion to compel discovery based on the collateral estoppel waiver theory is denied.

### III. *CONCLUSION*

\*6 For the foregoing reasons, the motion of defendant-counterplaintiff to compel discovery based on plaintiff-counterdefendant's 1985 document production is granted; plaintiff-counterdefendant to comply within 5 days. The motion of defendant-counterplaintiff to compel discovery based on the motion for partial summary judgment of plaintiff-counterdefendant is denied, subject to and conditioned upon plaintiff-counterdefendant's stated waiver of the use of "advice of counsel" as an explanation for its choice not to participate in the CIG case. We arrive at this decision with the understanding that, should plaintiff-counterdefendants position change as this matter develops, defendant-counterdefendant will be allowed discovery into "advice of counsel" with plaintiff-counterdefendant responsible for the cost of that discovery.

> FN1. According to UPR, Natural's refusal was fueled by a combination of factors. As the demand for natural gas slackened in the early 1980's, less product flowed through the Trailblazer System, due in part to competition from CIG's lower-priced pipeline. UPR attributes Natural's conduct to predatory motives designed to exclude CIG from the Wyoming natural gas transportation market. CIG employed this same characterization of Natural's actions in its 1984 lawsuit against Natural.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

(Appendix to Natural's Reply, Ex. B, at 3-4).

FN2. This matter was recently referred to this court for review and issuance of a Report and Recommendation.

FN3. We find it telling that UPR designated the documents produced in 1985 as privileged in its April 1, 1991 index, despite the fact that it maintains those documents are not now nor ever were privileged. UPR's argument that the designation in the April 1, 1991 index was inadvertent is tenuous for at least two reasons. First, any pressure UPR might have been under to produce the index was of its own manufacture. UPR balked at Natural's requests until a court order was necessary, and even then, UPR was tardy in its preparation. Second, even under such pressure, it is doubtful that UPR would be mistaken as to the nature of such a substantial number of documents, which were coincidentally produced without claims of privilege in the CIG case. The more believable explanation is that these documents were designated privileged because they are the type to which the privilege could be asserted-or waived, as it was in this case.

FN4. The documents Natural seeks are circled on the proposed order Natural has submitted with its motion to compel. We note that UPR has rather conclusorily argued that many of those documents are protected from discovery by work product. This argument, however, is an empty one as UPR has failed to provide any information regarding those documents to establish that the work product immunity applies, as it is UPR's burden to do. *In Re Air Crash Disaster at Sioux City, Iowa,* 153 F.R.D. 518, 531 (N.D.Ill.1990). The blanket assertion UPR offers is insufficient to meet its burden of establishing immunity. *H.L. Hayden Co. v. Siemens Medical Systems,* 108 F.R.D. 686, 688

(S.D.N.Y.1985).
N.D.Ill.,1991.
Union Pacific Resources Co. v. Natural Gas Pipeline Co. of America
Not Reported in F.Supp., 1991 WL 105505 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:90CV05378 (Docket) (Sep. 14, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT H**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 5792 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

▷

Briefs and Other Related Documents
North River Ins. Co. v. Columbia Cas.
Co.S.D.N.Y.,1995.Only the Westlaw citation is
currently available.
United States District Court, S.D. New York.
The NORTH RIVER INSURANCE COMPANY,
Plaintiff,
v.
COLUMBIA CASUALTY COMPANY, Defendant.
No. 90 Civ. 2518 (MJL).

Jan. 5, 1995.

*MEMORANDUM AND ORDER*
FRANCIS, United States Magistrate Judge.
**\*1** The North River Insurance Company ("North
River") brings this action against Columbia Casualty
Company ("Columbia Casualty") to recover defense
costs allegedly due under a reinsurance contract.
The plaintiff has moved for a protective order
pursuant to Rule 26(c) of the Federal Rule of Civil
Procedure on the ground that certain documents
requested by the defendant are immune from
disclosure under the attorney-client privilege and
work product doctrine.

*Background*

*The Underlying Action*

North River's reinsurance claim in this action arises
out of losses for asbestos-related defense costs which
it incurred under an excess liability insurance policy
(bearing number XS-3672) issued to Owens-Corning
Fiberglass ("Owens-Corning") during 1974-75.
North River initially denied that it owed any
obligation to provide coverage to Owens-Corning for
defense costs, but it agreed to submit the dispute for a
binding resolution through an alternate dispute
resolution proceeding ("ADR"). In July 1989, the
arbitrator determined that North River was required
to pay defense costs. The plaintiff commenced an
appeal of the ADR decision, but subsequently
abandoned that effort. North River thereafter filed
suit against eight reinsurance companies alleging that
each was responsible for reinsuring a share of the
costs of defense. Columbia Casualty, the sole

defendant remaining in this action, contends that
costs of defense were not covered under the excess
policy between North River and Owens-Corning, and
thus are not covered under its reinsurance agreement
with North River. The defendant maintains that any
obligation incurred by North River to pay such costs
was due to its failure to preserve its rights under an
arrangement known as the Wellington Agreement,[FN1]
and may not be recovered from Columbia Casualty.

*The Rule 26(c) Motion*

On July 12, 1994, Columbia Casualty made the
following request for production of documents to
North River:
We need all documents between, among or with
respect to Crum & Forster [North River's parent
company] and its attorneys (including Simpson
Thacher & Bartlett) regarding its dispute with
Owens-Corning over North River's obligation to pay
Owens-Corning's attorney's fees.

Affidavit of Andrew S. Amer dated Oct. 21, 1994,
Exh. A (hereinafter "the ADR Documents"). In
response, North River asserted that the ADR
Documents are protected from disclosure under the
attorney-client privilege and work product doctrine,
and it has thus declined to produce them. Amer Aff.
¶ 12. Columbia Casualty claims that these
privileges are inapplicable here because: (1) as North
River's reinsurer, Columbia Casualty shares a
"common interest" in the subject matter of the ADR
Documents; (2) North River has breached its
fiduciary duty to Columbia Casualty; (3) North
River has placed its good faith conduct regarding the
ADR "in issue"; and (4) the ADR Documents
establish North River's fraudulent conduct in the
ADR proceeding.

**\*2** Following a September 29, 1994 status
conference, Columbia Casualty also requested that
North River produce two specific memoranda: (1) an
internal memorandum prepared by Crum & Forster's
in-house counsel Bradford Rich, entitled "Legal
Analysis Concerning Appeal of Owens-Corning
ADR Decision" (the "Rich Memo"); and (2) a
January 28, 1988, memorandum by George B.
Luteran, a senior claims specialist for Crum &
Forster, which summarized a meeting Mr. Luteran
had with counsel regarding a settlement offer made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by Owens-Corning ("the Luteran Memo"). Amer Aff. ¶ 13. Columbia Casualty asserts that North River waived the attorney-client privilege with respect to these documents by disclosing them to CIGNA Insurance Company ("CIGNA"), another reinsurer sued by North River for claims arising out of the Owens-Corning dispute. Finally, Columbia Casualty alleges that North River's privilege log is incomplete and argues that the plaintiff should therefore be precluded from asserting any privilege.

North River now seeks a protective order pursuant to Rule 26(c) to preclude discovery of the ADR Documents and the Luteran and Rich Memos.

### Discussion

Because this is a diversity case, New York law governs privilege issues. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y.1993); *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 443 (S.D.N.Y.1990). The attorney-client privilege has been codified in New York. CPLR § 4503(a). The burden of demonstrating that the privilege applies rests with the party invoking it. *See Bowne*, 150 F.R.D. at 470; *Priest v. Hennessey*, 51 N.Y.2d 62, 69, 431 N.Y.S.2d 511, 514 (1980). Here there is no dispute that the basic requirements of the privilege are met; the controversy concerns the applicability of the exceptions raised by Columbia Casualty.

### I. The ADR Documents

#### A. Common Interest Doctrine

The first argument advanced by Columbia Casualty with respect to the ADR documents is that because Columbia Casualty shared a "common interest" with North River in the ADR proceedings, it is entitled to documents from that proceeding that would otherwise be privileged. The common interest doctrine subsumes a number of principles that are sometimes characterized as separate rules and at other times conflated into a single axiom. *Compare Weil Ceramics & Glass, Inc. v. Work*, 110 F.R.D. 500, 502-03 (E.D.N.Y.1986) (distinguishing "common defense rule" from "community of interest rule") *with United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (joint defense privilege "more properly identified as the 'common interest rule' "). The nomenclature is less important than a

determination of the outer boundaries of the doctrine.

At its core,
The "common interest" doctrine applies when multiple persons are represented by the same attorney. In that situation, communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world. The clients may not, however, later assert the privilege against each other after their interests become adverse.

**\*3** *North River Insurance Co. v. Philadelphia Reinsurance Corp.*, 797 F.Supp. 363, 366 (D.N.J.1992) ("*North River I* ") (citations omitted). Some courts consider such dual representation situations to be the outer limit of the common interest doctrine. *See International Insurance Co. v. Newmont Mining Corp.*, 800 F.Supp. 1195, 1196 (S.D.N.Y.1992) (common interest doctrine inapplicable because no joint representation); *North River I*, 797 F.Supp. at 367 ("the common interest doctrine is completely unleashed from its moorings in traditional privilege law when it is held broadly to apply in contexts other than when there is joint representation").

Nevertheless, the weight of authority is that the common interest doctrine does extend at least to situations "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 872 F.2d at 243. That is, the doctrine applies where parties are represented by separate counsel that engage in a common legal enterprise. Under such circumstances, it is not necessary for litigation to be in progress for the common interest doctrine to apply. *Id.* at 244. Although originally developed in the context of cooperation between codefendants in criminal cases, this extension of the doctrine is fully applicable to parties in civil cases as well. *See In re Bairnco Corp. Securities Litigation*, 148 F.R.D. 91, 102 (S.D.N.Y.1993); *Weil Ceramics*, 110 F.R.D. at 503.

More troublesome is the question of whether the doctrine can be stretched to apply to communications between entities that have parallel interests but are not actively pursuing a common legal strategy. In its most extreme form, this version of the common interest doctrine has been described as follows:
A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1995 WL 5792 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

_Duplan Corp. v. Deering Milliken, Inc._, 397 F.Supp. 1146, 1172 (D.S.C.1975). Having articulated this definition, however, the _Duplan_ court quickly acknowledged that "[i]t is not so clear ... that the attorney-client privilege can survive such an interchange." _Id._ Indeed, in applying the common interest doctrine to the patent case before it, the court appeared to require a very close nexus among the parties. On one hand, the court found that a community of interest existed between a party and another entity which, although a non-party, was contractually obligated to act as the party's legal patent advisor. _Id._ at 1175. On the other hand, the exclusive licensee under the patents, although it had a clear commercial interest in the litigation, was found to lack a sufficiently similar legal interest. _Id._ Thus, even the extreme form of the common interest doctrine articulated in _Duplan_ included only "those situations involving either the legal duty to defend another entity or the common interest arising from a client transaction between two separate entities which are represented by the same attorney." _Weil Ceramics_, 110 F.R.D. at 503.

**\*4** Of particular relevance here are cases that apply the common interest doctrine in the context of relations between insurers and their insured. It is clear that when an insurer actually retains counsel to provide a defense for the insured, there is a common legal interest. As a consequence, communications between the insured and the attorney are privileged as to outside parties, but not as to the insurer. _See Pittston Co. v. Allianz Insurance Co.,_ 143 F.R.D. 66, 69 (D.N.J.1992); _Emons Industries, Inc. v. Liberty Mutual Insurance Co.,_ 747 F.Supp. 1079, 1082 (S.D.N.Y.1990).

However, when the insurer does not appoint counsel for the insured, the common interest theory breaks down. _See Bituminous Casualty Corp. v. Tonka Corp.,_ 140 F.R.D. 381, 386-87 (D.Minn.1992). The insurer may have the same "desire" as the insured that the insured not be found liable for damages in an

underlying action, but this does not qualify as an identical legal interest. _See International Insurance,_ 800 F.Supp. at 1196. Indeed, in some respects the insurer's legal interest may directly conflict with that of the insured, as on questions of coverage. _See NL Industries, Inc. v. Commercial Union Insurance Co.,_ 144 F.R.D. 225, 231-32 (D.N.J.1992). One court has observed:

The insurer asserts that the parties shared an interest in lowering the amount of damage in the underlying action. Even assuming this to be true, the parties did not then and do not now share an interest in characterizing how that damage occurred, what type of damage has occurred, or how [the insured] responded to the damage.

_Remington Arms Co. v. Liberty Mutual Insurance Co.,_ 142 F.R.D. 408, 418 (D.Del.1992).

The common thread of these cases is that the determination of whether the common interest doctrine applies cannot be made categorically. Just as some criminal co-defendants will have a common strategy while others have antagonistic defenses, so some insurers will mount a common defense with their insured in an underlying liability action while others will not. What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal.

This rationale applies with even greater force in the reinsurance context. While a direct insurer may have a duty to defend its insured, thus implying some level of cooperation in litigation, no such duty is imposed on a reinsurer. _Cf. North River I,_ 797 F.Supp. at 367. And, as in the direct insurance context, the interests of the ceding insurer and the reinsurer may be antagonistic in some respects and compatible in others. Thus, a common interest cannot be assumed merely on the basis of the status of the parties.

Thus far, this analysis has drawn on federal caselaw. It is nevertheless consistent with the few cases in New York that address the common interest doctrine. In _People v. Osorio,_ 75 N.Y.2d 80, 550 N.Y.S.2d 612 (1989), the Court of Appeals applied the doctrine to codefendants in a criminal case. "If the codefendants are mounting a common defense their statements are privileged but unless the exchange is for that purpose the presence of a codefendant or his counsel will destroy any expectation of confidentiality between a defendant and his attorney." _Id._ at 85, 550 N.Y.S.2d at 615 (citations omitted). Thus, New York courts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

take a functional rather than a categorical approach.

*5 New York courts have also applied the common interest doctrine in the insurance context to a limited extent:

[W]hen an attorney acts for two different parties having a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties. This is especially the case where an insured and his insurer initially have a common interest in defending an action against the former, and there is a possibility that those communications might play a role in a subsequent action between the insured and his insurer.

Goldberg v. American Home Assurance Co., 80 A.D.2d 409, 413, 439 N.Y.S.2d 2, 5 (1st Dep't 1981). These courts utilize the common interest doctrine when the insurer selects the attorney for the insured. See Liberty Mutual Insurance Co. v. Engels, 41 Misc.2d 49, 50-51, 244 N.Y.S.2d 983, 985-86 (Sup.Ct.Kings Co.1963), aff'd, 21 A.D.2d 808, 250 N.Y.S.2d 851 (2d Dep't 1964). However, it does not appear that any court in New York has found the doctrine applicable merely because the parties in question are an insured and its insurer.[FN2]

When these principles are applied to the instant case, it is apparent that North River and Columbia Casualty did not have a common interest in the ADR proceedings. Clearly they were not represented by the same counsel, and Columbia Casualty did not contribute to North River's legal expenses nor exercise any control over its conduct of the proceedings. Nor is there any evidence that the two coordinated litigation strategy in any way. While their commercial interests coincided to some extent, their legal interests sometimes diverged, as demonstrated by the instant litigation. In short, Columbia Casualty's only argument for finding a common interest is that the two parties stand in the relation of reinsurer to ceding insurer, and that is insufficient.

### B. The Fiduciary Relationship

Columbia Casualty also argues that the ADR Documents are discoverable because "it is well settled that the existence of the fiduciary relationship creates an exception to the attorney-client privilege." Columbia Casualty Memorandum of Law, at 20. Such an exception, however, is inapplicable to this case. While a reinsured owes a duty of good faith to its reinsurer, the Second Circuit has held that:

[any] characterization of the relationship between a reinsured and reinsurer as being inevitably fiduciary in nature is one we are unable to adopt. To the contrary, because these contracts are usually negotiated at arms length by experienced insurance companies, there is no reason to label the relationship as "fiduciary."

Christiania General Insurance Corp. of New York v. Great American Insurance Co., 979 F.2d 268, 280-81 (2d Cir.1992) (citations omitted); see also North River I, 797 F.Supp. at 370 (duty which governs relationship between reinsured and reinsurer does not demonstrate the "presence of sufficient influence and control over the affairs of another necessary to give rise to fiduciary responsibilities"). North River therefore did not owe any fiduciary duty to Columbia Casualty to disclose the contents of the ADR Documents.

### C. The "In Issue" Doctrine

*6 Columbia Casualty further argues that "[b]y suing and putting in issue its utmost good faith in connection with all its actions respecting the ADR, North River has waived any associated attorney client privilege." Columbia Casualty Memorandum of Law, at 21. The "in issue" doctrine is operative "when the party has asserted a claim or defense that he intends to prove by use of the privileged materials." Pittston Co., 143 F.R.D. at 71 (citing Remington Arms, 142 F.R.D. at 415); see also North River I, 797 F.Supp. at 370 (attorney-client privilege waived only when party places in issue contents of attorney-client communication). In this case, North River has not based any of its claims or defenses on the ADR Documents. Moreover, Columbia Casualty has not identified any other manner through which North River has placed the advice of its counsel or other contents of any privileged communication in issue in this action. Instead, Columbia Casualty seeks the ADR Documents as part of its own defense to prove that North River did not act in good faith during the ADR proceeding and subsequent appeal process. The fact that North River merely placed the broad question of coverage in issue is not sufficient to constitute a waiver of its attorney-client privilege with respect to the ADR Documents.

### D. The Crime/Fraud Exception

Columbia Casualty alleges that North River acted in

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1995 WL 5792 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

a grossly negligent manner by failing to preserve its rights under the Wellington Agreement, thereby incurring the excess defense costs which it now seeks from Columbia Casualty.    The defendant further alleges that the Luteran and Rich Memos demonstrate North River's attempt to fraudulently conceal such negligence in order to "dishonestly shift the defense costs liability resulting from [such] grossly negligent conduct to its reinsurers."    Columbia Casualty Memorandum of Law, at 26 (emphasis omitted). Therefore, the defendant claims that the ADR Documents, as well as the Luteran and Rich Memos themselves, are not protected by the attorney-client privilege.

Columbia Casualty's reliance on the crime/fraud exception is misplaced.    The Second Circuit has held that:
the crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in [fraudulent] activity. The exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or conceal [such] activity.

*In re Grand Jury Subpoenas Duces Tucem,* 798 F.2d 32, 34 (2d Cir.1986).    Probable cause exists when there is some evidence that "(1) the communications were elicited as part of an ongoing scheme to commit a fraud, and (2) the client was aware at the time of the communication that he was participating in a fraud." *United States v. Rivera,* 837 F.Supp. 565, 568-69 (S.D.N.Y.1993).

*7 Excerpts from the Luteran Memo and the Rich Memo were published in *North River Insurance Co. v. Philadelphia Reinsurance Corp.,* 831 F.Supp. 1132 (D.N.J.1992) ("*North River II*"), a decision involving the same universe of facts as in the instant case.    The Luteran Memo, written after North River rejected a compromise settlement made by Owens-Corning, states that "if [Crum & Forster] were to compromise on the allocated [defense] costs issue, we would have an extremely difficult time in recovering any money spent for such costs from our reinsurers." *Id.* at 1139. The Rich Memo, written during the time North River contemplated an appeal of the adverse ADR ruling, states that "[t]he issues presented are difficult, ... [and] on balance we conclude that the risks of appeal outweigh the potential benefit." *Id.*

Although a review of these attorney-client communications might lead to the conclusion that

North River potentially violated its duty of utmost good faith to its reinsurers, including Columbia Casualty, the communications do not demonstrate that North River and its attorneys were engaged in an ongoing scheme to fraudulently conceal North River's allegedly negligent conduct in the ADR proceeding.    From the motion papers submitted to this Court, it is clear that Columbia Casualty received information from North River regarding the ADR proceeding and subsequent appeal, and more importantly, used this information as the basis for denying reinsurance coverage to North River.    *See, e.g.,* Amer Reply Aff., Exh. F & H.    The excerpts of the Luteran Memo and the Rich Memo published in *North River II* constitute nothing more than the balancing of potential rights and liabilities that typically characterize attorney-client communications.    Thus, Columbia Casualty has proffered no evidence establishing that probable cause exists to implicate North River and its attorneys in a crime or fraud.

### II. *The Luteran and Rich Memos*

North River also seeks a protective order barring disclosure of the Luteran and Rich memos. Columbia Casualty argues that North River waived the attorney-client privilege with respect to these documents when it disclosed them to CIGNA. CIGNA in turn utilized the memos in litigation against North River where they were quoted in a published opinion.    *See North River II,* 831 F.Supp. at 1139-40, 1147.    North River, however, maintains that it shared a common interest with CIGNA in "assisting [CIGNA] in evaluating North River's reinsurance bills."    North River Memorandum of Law, at 17.    If that is the case, the documents could remain privileged notwithstanding their disclosure to CIGNA.

North River now seeks to rely on the common interest doctrine, while it resisted application of the same principles in the context of the ADR documents.    It attempts to reconcile these positions by resorting to martial imagery.    According to North River, common interest principles should be viewed differently when they are used as a "shield" to resist discovery than when they are wielded as a "sword" to compel disclosure.    There is no authority for this distinction.

*8 When a party is using the common interest doctrine as a "sword" and seeking discovery of an attorney-client communication, it presumably was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 6
Not Reported in F.Supp., 1995 WL 5792 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

not privy to that communication in the first place. That may be some indication that the party demanding disclosure did not in fact engage in any common legal enterprise with the party with whom it claims a common interest. But although this factor may be influential in a common interest analysis, it is not determinative. Whether two parties share a common interest is a question subject to the analysis discussed above, independent of whether the party asserting such an interest is seeking to discover or to protect from discovery an attorney-client communication.

Applying such an analysis, it is clear that North River and CIGNA had no common legal interest. On the contrary, their interests in this instance were antagonistic. In the process of seeking payment from CIGNA under their reinsurance contract, North River provided the Luteran and Rich Memos, apparently hoping that CIGNA would be persuaded to pay. It was not, and litigation ensued. At no point did North River and CIGNA engage in a common legal enterprise, and the common interest doctrine therefore does not apply.

Accordingly, the disclosure of the Luteran and Rich Memos to CIGNA constituted a waiver of the attorney-client privilege by North River. Having waived the privilege as to one third-party, North River cannot now resurrect it as a barrier to discovery by Columbia Casualty.[FN3]

### Conclusion

For the reasons set forth above, North River's motion for a protective order is granted with respect to the ADR documents and denied with respect to the Luteran and Rich Memos.[FN4]

SO ORDERED.

FN1. Asbestos manufacturers and their insurers entered into the Wellington Agreement in 1985 in an attempt to simplify and reduce the costs of resolving insurance coverage claims arising from the sale of asbestos.

FN2. The only case in any jurisdiction to go so far in expanding the common interest doctrine is *Waste Management, Inc. v. International Surplus Lines Insurance Co.,* 144 Ill.2d 178, 579 N.E.2d 322 (1991).

There the Illinois Supreme court extended the common interest doctrine in the insurer/insured context to include situations where the insured's counsel, "though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer." *Id.* at 183, 579 N.E.2d at 328-29 (citations omitted). Under this analysis, an insurer may claim that because it has the same "desire" as the insured to have a successful defense of the underlying action, it thus shares a "common interest" with the insured that voids the attorney-client privilege. The *Waste Management* decision has been sharply criticized by other courts. *See, e.g., North River I,* 797 F.Supp. at 367; *Remington Arms,* 142 F.R.D. at 417-18; *Bituminous Casualty Corp.,* 140 F.R.D. at 386-87. There is no basis for believing that New York courts would adopt its reasoning.

FN3. The fact that the Luteran and Rich Memos were quoted in *North River II* has no bearing on this determination. It was their prior disclosure to CIGNA, not their publication in a judicial opinion, that waived the privilege.

FN4. Columbia Casualty's contention that the motion should be denied because of inadequacy of North River's privilege log is without merit. That log is as detailed as the log provided by Columbia Casualty itself and it proved fully sufficient for purposes of deciding the instant motion.
Likewise, Columbia Casualty's request that the documents be reviewed *in camera* is denied. The instant motion raises legal issues that can be determined without reference to the specific documents.

S.D.N.Y.,1995.
North River Ins. Co. v. Columbia Cas. Co.
Not Reported in F.Supp., 1995 WL 5792 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:90cv02518 (Docket) (Apr. 12, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

LEXSEE

**CONVOLVE, INC. and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Plaintiffs, -against- COMPAQ COMPUTER CORP. and SEAGATE TECHNOLOGY, Defendants.**

**00 Civ. 5141 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 69425*

**September 27, 2006, Decided
September 27, 2006, Filed**

**SUBSEQUENT HISTORY:** As Amended October 18, 2006.

**PRIOR HISTORY:** *Convolve, Inc. v. Compaq Computer Corp., 2006 U.S. Dist. LEXIS 62606 (S.D.N.Y., Aug. 31, 2006)*

**COUNSEL:** [*1] For Convolve, Inc., Massachusetts Institute of Technology, Plaintiffs: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Albert L. Jacobs, Jr., Greenberg Taurig, LLP, New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Richard E. Kurtz, Greegberg Taurig LLP, McLean, VA; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Compaq Computer Corp., Defendant: Herbert F. Schwartz, Robert W. Morris, Ropes & Gray, LLP(NYC), New York, NY; Robert F. Bahrampour, Robes & Gray LLP, New York, NY; Robert J. Goldman, Ropes & Gray, LLP (CA), Palo Alto, CA.

For Seagate Technology, Inc., Seagate Technology, L.L.C., Defendants: G. Hopkins Guy, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA; Michael S Sommer, McDermott, Will & Emery, LLP (NY), New York, NY; Stephen J. Akerley, McDermott, Will & Emery LLP, Palo Alto, CA; Terrence P. McMahon, McKermott, Will & Emery LLC, Palo Alto, CA.

For American International Underwriters Insurance Company, National Union Fire Insurance Company of Pittsburgh, P.A., Movants: William T. Corbett, Drinker Biddle & Reath LLP, New York, NY, US.

For Seagate Technology, Inc., Counter [*2] Claimant: G. Hopkins Guy, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA; Michael S Sommer, McDermott, Will & Emery, LLP (NY), New York, NY.

For Convolve, Inc., Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Richard E. Kurtz,Richard E. Kurtz, Greegberg Taurig LLP, McLean, VA; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Massachusetts Institute of Technology, Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Albert L. Jacobs, Jr., Greenberg Taurig, LLP, New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Richard E. Kurtz, Greegberg Taurig LLP, McLean, VA; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Seagate Technology, Inc., Counter Claimant: G. Hopkins Guy, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA; Terrence P. McMahon, McKermott, Will & Emery LLC, Palo Alto, CA.

For Convolve, Inc., Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft [*3] LLP (NYC), New York, NY; Richard E. Kurtz, Greegberg Taurig LLP, McLean, VA; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Massachusetts Institute of Technology, Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Green-

berg Taurig, LLP (NYC), New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Richard E. Kurtz, Greegberg Taurig LLP, McLean, VA; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Convolve, Inc., Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

For Massachusetts Institute of Technology, Counter Defendant: Adam Benjamin Landa, Tom M. Fini, Greenberg Taurig, LLP (NYC), New York, NY; Debra Brown Steinberg, Cadwalader, Wickersman & Taft LLP (NYC), New York, NY; Albert L. Jacobs, Jr., Graham & James LLP, New York, NY.

**JUDGES:** George B. Daniels, United States District Judge.

**OPINION BY:** George B. Daniels

**OPINION:**

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge:

Seagate Technology LLC ("Seagate") moves for [*4] certification of an interlocutory appeal, pursuant to *28 U.S.C. § 1292(b)*, of two orders issued by Magistrate Judge Francis, and two motions denied by this Court, relating to defendants' obligation to produce certain communications to and from their respective trial attorneys, which are relevant to defendants' advice-of-counsel defense. The motion is denied.

Plaintiffs Convolve, Inc. and Massachusetts Institute of Technology (collectively "Plaintiffs") sued defendants Seagate and Compaq Computer Corp. ("Compaq") for, *inter alia,* willful patent infringement of certain patents owned by Plaintiffs. Both Seagate and Compaq asserted the advice-of-counsel defence, i.e., that they acted in good faith because they relied on the advice of counsel when engaging in the allegedly infringing conduct. Seagate and Compaq conceded that by asserting the advice-of-counsel defense, they waived attorney-client privilege as to communications between them and the attorneys they hired to provide opinions on the legality of their conduct. n1 Seagate and Compaq disputed, however, whether the waiver extended to the communications to and from their respective trial attorneys. This [*5] Court referred the case to Magistrate Judge Francis for pre-trial supervision and for resolution of these discovery disputes.

n1 In Seagate's case, that attorney was Gerald T. Sekimura. His opinions will be referred to as the "Sekimura Opinions."

Magistrate Judge Francis issued an order on May 28, 2004, published as *Convolsve, Inc. V. Compaq Computer Corp., 224 F.R.D. 98 (S.D.N.Y. 2004),* holding that in asserting the advice-of-counsel defense, Seagate "waived the attorney-client privilege as to all communications not only with Mr. Sekimura, but also with its other attorneys, including trial counsel, concerning the subject matter of Mr. Sekimura's advice." *Id. at 104.* Therefore, Magistrate Judge Francis ordered Seagate to "produce all documents, answers to interrogatories, and deposition testimony concerning communications between Seagate (or its in-house counsel) and any of its attorneys, including trial counsel," related to the subject matter of the Sekimura Opinions. *Id. at 105.* [*6] Magistrate Judge Francis issued a second order, dated September 8, 2004, granting plaintiff Convolve's application to compel Seagate and Compaq to produce all documents subject to disclosure under May 28th order.

Seagate moved, pursuant to *Fed. R. Civ. P. 72(a),* for an order by this Court sustaining its objections to, and overruling, the May 28th order. Seagate also sought an order by this Court, pursuant to *Fed. R. Civ. P. 72(a),* sustaining its objections to, and overruling, the Magistrate Judge's Sept. 8th order. Both of Seagate's *Rule 72(a)* motions were denied by this Court on July 11, 2006. Seagate now seeks certification of an interlocutory appeal of all four decisions.

An interlocutory appeal is "a rare exception to the final judgement rule that generally prohibits piecemeal appeals," *Koehler v. Bank of Bermuda, Ltd., 101 F.3d 863, 865 (2d Cir. 1996),* and only "exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment, *In re Flor, 79 F.3d 281, 284 (2d Cir. 1996)* (citations and [*7] alteration omitted). Certification of an interlocutory appeal is appropriate only if the challenged order (1) involves a controlling issue of law, (2) as to which there is a substantial ground for difference of opinion, and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. *28 U.S.C. § 1292(b); Taylor v. PPG Industries, Inc., 256 F.3d 1315, 1316 (Fed. Cir. 2001)* (citing *28 U.S.C. § 1292(b)).*

Seagate cannot satisfy the requirements of *28 U.S.C. § 1292(b).* In this case, the orders at issue only address a pre-trial discovery dispute, namely, the scope of Seagate's waiver of the attorney-client and work-product privileges, a determination that lies within the sound

discretion of the district court, see, e.g., *In re EchoStar Communications Corp., 448 F.3d 1294, 1300 (Fed. Cir. 2006)* ("We review the district court's determination as to the scope of the waiver for an abuse of discretion."), and "depends heavily on the factual context in which the privilege is asserted." *In re Sealed Case, 278 U.S. App. D.C. 188, 877 F.2d 976, 981 (D.C. Cir. 1989)*; [*8] *see also Wills v. Amerada Hess Corp., 379 F.3d 32, 41 (2d Cir. 2004)* (stating that the district court has "broad discretion to direct and manage the pretrial discovery process"). Fact-dependant matters that are within the court's discretion, such as the scope of a privilege waiver, do not involve a "controlling issue of law" under *§ 1292(b)*. See, e.g., *White v. Nix, 43 F.3d 374, 376, 377-78 (8th Cir. 1994)* (holding that the district court's order requiring production of documents claimed to be protected by the attorney work product doctrine, a matter "committed to the district court's discretion," did not involve a controlling issue of law under *§ 1292(b)* warranting certification for and interlocutory appeal); *Casey v. Long Island R. Co., 406 F.3d 142, 146-47 (2nd Cir. 2005)* (holding that the district court's decision to set aside the jury award did not present a controlling issue of law warranting certification of an interlocutory appeal under *§ 1292(b)* because the excessiveness of the jury's award "presents a question as to the proper evaluation of the evidence introduced at trial" and that evaluation "is accorded *differential* review") [*9] (emphasis added); *Schine v. Schine, 367 F.2d 685, 688 (2d Cir. 1966)* (holding that an order denying defendants' motion for a separate trial did not meet the requirements for certification of an interlocutory appeal because " *whether the district court abused his discretion* in granting or denying a separate trial . . . may rarely, if ever, involve a 'controlling question of law'" under *§ 1292(b)*) (emphasis added).

Nor has Seagate demonstrated that it is an extraordinary case warranting departure from the general rule that appeals may not be taken from final judgments. The material that Seagate is required to produce under the May 28th order is limited--only "documents, answered to interrogatories, and deposition testimony" that relate to the subject matter of the Sekimura Opinions must be pro-

duced. *Convolve, Inc. 224 F.R.D. at 105*. In addition, in an effort to minimize disclosure of trial or litigation strategy, any material that Seagate believes would reveal protected information can be submitted for *in camera* review. Even though Magistrate Judge Francis ordered the production of certain communications between Seagate and its trial counsel, he specifically [*10] provided:

> Nevertheless, care should be taken to minimize the disclosure of communications pertaining to trial or litigation strategy. To be sure, trial counsel's advice that undermines the reasonableness of the clients reliance on advice of opinion counsel must be disclosed even if it is communicated in the context of trial preparation. But, at the same time, trial counsel will surely address with the client trial strategy concerning validity, infringement, and enforcement in ways that do not implicate the advice-of-counsel defense. Therefore, to the extent that Seagate wishes to withhold or redact documents that would reveal trial strategy or planning, it shall submit those documents for my *in camera* review.

*Convolve, Inc. 224 F.R.D. at 105*. Seagate's opportunity to submit for *in camera* review any document it "wishes to withhold or redact," makes this an issue not ripe for appellate review.

Seagate's motion for certification of an interlocutory appeal pursuant to *28 U.S.C. § 1292(b)* is DENIED.

Dated: New York, New York

SO ORDERED:

George B. Daniels

United States District Judge

# EXHIBIT J

LEXSEE

**COMPUTER ASSOCIATES INTERNATIONAL, INC., Plaintiff, - against - SIMPLE.COM, INC., WIRED SOLUTIONS, LLC., a revoked Nevada LLC, Defendants.**

**02 Civ. 2748 (DRH) (MLO)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 77077*

**October 20, 2006, Decided**
**October 23, 2006, Filed**

**COUNSEL:** [*1] HELLER EHRMAN WHITE & MCAULIFFE LLP, Attorneys for Plaintiff, San Francisco, California, By: James R. Knox, Esq., L. J. Chris Martiniak, Esq., Michael M. Markman, Esq., Michele K. Connors, Esq., & Robert D. Fram, Esq.

FARRELL FRITZ, P.C., Attorneys for Defendants, Uniondale, New York, By: Stephen J. Smirti, Jr., Esq., John P. McEntee, Esq., & Celeste M. Butera, Esq.

FULBRIGHT & JAWORSKI LLP, Attorneys for Defendants, Minneapolis, Minnesota, By: Alan M. Anderson, Esq., Mark E. Ungerman, Esq., Sharna A. Wahlgren Esq., & Steven M. War, Esq.

RIVKIN RADLER LLP, Attorneys for Defendants, Uniondale, New York, By: Celeste M. Butera, Esq.

GALE R. PETERSON, ESQ., Special Master, San Antonio, Texas.

**JUDGES:** Denis R. Hurley, United States Senior District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION:**

**MEMORANDUM & ORDER**

**HURLEY, Senior District Judge:**

*INTRODUCTION*

Plaintiff Computer Associates International, Inc. ("CA" or "Plaintiff") objects to the Report and Recommendation ("R&R") of Special Master Gale Peterson on Defendants' motion to compel documents related to

Plaintiff's advise of counsel defense to Defendants' claim of willful infringement. For the reasons set forth [*2] herein, the Court adopts the R&R and grants Defendants' motion to compel.

*BACKGROUND*

Plaintiff "is a provider of software solutions and services for the management of information technology infrastructure, business information, and application development." (3d Amended Complaint P 2.) Defendants Simple.com, Inc. and Wired Solutions, LLC (collectively "Simple") are the current owners of three patents: *U.S. Patent Nos. 6,272,493* ("493"), 6,434,563 ("563"), and 6,535,882 ("882"). CA commenced the present action in May 2002. As amended, the complaint seeks a declaratory judgment that the three patents are invalid, unenforceable, and "not infringed" by Plaintiff's products. (*See id.* P 34.) Simple has counterclaimed against CA for willful infringement. (Amended Answer and Counterclaims PP 11-25 and Prayer for Relief P 5.)

On September 1, 2004, CA notified Simple that it elected to invoke the advice of counsel defense to rebut the accusation of willful infringement. CA produced two opinions of Cooper & Dunham, LLP relating solely to the validity of the patents in suit. The first opinion is dated September 5, 2003 and relates to the *'493 patent*. The second opinion is dated March 3, 2004 and [*3] relates to the '882 and '563 patents.

CA has produced documents in response to Simple's document request for "[a]ll attorney's opinions upon which you intend to rely in asserting any defense against a claim of willful infringement in this case and all documents related to any such opinion." However, CA did not produce any communications between it and its Litigation Counsel claiming attorney-client privilege. Simple

then moved before the Special Master for an order to compel.

By Order dated November 24, 2004, the Special Master granted the motion. After a thorough discussion of the then existing, and conflicting, case law, the Special Master rejected CA's claims that it did not waive the attorney-client privilege as to Litigation Counsel:

> [I]t is known that Cooper & Dunham have given written opinions that CA has chosen to rely on in its advice of counsel defense. CA has thus chosen to place those opinions "at issue" in this litigation. Whether CA has received communications or advice from Heller Ehrman or it prior trial counsel on the subject matter of the Cooper & Dunham opinions is unknown, but given that CA has chosen to place the Cooper & Dunham opinions "at issue" [*4] in this lawsuit opens the door for Simple to examine what other advice CA received on that subject matter, whether conflicting or not.

(Special Master's Order at p. 23.) Further, the Special Master rejected CA's proposed temporal limitation limiting the waiver of privilege vis-a-vis trial counsel to the period prior to the commencement of the suit. (*Id.* at pp. 23-24.) Nonetheless, in order to protect litigation or trial strategy, the Special Master provided that any materials concerning the subject matter of the Cooper & Dunham opinions that also relate to trial or litigation strategy should be submitted for *in camera* review.

CA filed objections to the Special Master's Order arguing principally that because litigation counsel and opinion counsel serve different functions, the scope of the privilege rules must be different and that the Federal Circuit's precedent favors protecting the attorney-client privilege over the "marginal" benefit that might be derived from extending the waiver to Litigation Counsel. Simple has responded, arguing that the scope of CA's waiver of the attorney-client privilege included communications from litigation counsel relating to the subject [*5] matter of its advise of counsel defense.

*STANDARD*

The parties dispute the appropriate standard to be applied to the Special Master's Report and Recommendation. The Order appointing the Special Master in this case provides in pertinent part: "Review of an appeal from all orders and recommendations, as well as the standard of review, shall be governed by *Federal Rules*

*of Civil Procedure 72* and associated case law." *Federal Rule 72* of Civil Procedure provides that non-dispositive rulings will be modified by the District Court only if "clearly erroneous or contrary to law." Discovery orders are generally considered non-dispositive. *See Webb v. Robert Lewis Rosen Assocs., 128 Fed. Appx. 793, 2005 U.S. App. LEXIS 5710 at p. 6 (2d Cir. 2005); Thomas E. Hoar v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990).*

*DISCUSSION*

At issue in this case is the extent of the waiver of the attorney client privilege n1 by an alleged infringer who asserts the defense of advice of counsel in response to a claim of willful infringement. Specifically, the question is whether the waiver extends to any and all attorney client communications [*6] on the same subject matter n2 including communications with trial counsel. Because questions of privilege and discoverability arising from a defense of advice of counsel involve substantive patent law, they are governed by the law of Federal Circuit. *In re EchoStar Communications Corp., 448 F.3d 1294, 1298 (Fed. Cir. 2006)*(citing *In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803-03 (Fed. Cir. 2005)*).

> n1 Although related, the attorney-client privilege and work product immunity "are distinct concepts and waiver of one does not necessarily waive the other." *In re Echostar Communications Corp., 448 F.3d 1294, 1300 (Fed. Cir. 2006)*. This opinion, like the Special Master's R&R, only addresses the issue of waiver of the attorney-client privilege.

> n2 In this case, the subject matter of the Cooper & Dunham opinion is the validity of the patents in suit.

Under *35 U.S.C. § 284*, damages awarded for patent infringement may be increased where [*7] the infringement is willful. *Read Corp. v. Portec Inc., 970 F.2d 816, 826 (Fed. Cir. 1992); Beatrice Foods Co. v. New England Printing & Lithographing Co., 923 F.2d 1576, 1578 (Fed. Cir. 1991).* A party in a patent infringement action may assert the advice of counsel as a defense to a claim of willful infringement. Reliance on the advice must be reasonable as the determination of willfulness centers on the infringer's state of mind. *See Ortho Pharmaceutical Corp. v. Smith, 959 F.2d 936, 944 (Fed. Cir. 1992).* Once a party notifies its adversary that it will rely on the advice of counsel defense, the attorney-client privilege is waived. As the Federal Circuit recently reiterated, "[t]he widely applied standard for determining the scope of a

waiver of attorney-client privilege is that the waiver applies to all other[attorney-client] communications relating to the same subject matter." *In re EchoStar, 448 F.3d at 1299* (quoting *Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349 (Fed. Cir. 2005)).* "The waiver extends beyond the document initially produced out of concern for fairness, so that a party [*8] is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Fort James Corp., 412 F.3d at 1349* (internal citations omitted).

The Federal Circuit's most recent pronouncement on the question of waiver of the attorney-client privilege and work product doctrine arising from the advice of counsel defense is *In re Echostar, 448 F.3d 1294 (Fed. Cir. 2006).*

*EchoStar* involved questions of waiver of both attorney-client privilege and work-product immunity. With regard to the waiver of attorney-client privilege resulting from the assertion of the advice of counsel defense, the Federal Circuit concluded that when a party chooses "to rely on the advice of in-house counsel, it waive[s] the attorney client privilege with regard to *any attorney client communication relating to the same subject matter, including communications with counsel other than* [the counsel who rendered the opinion relied upon]." *Id. at 1299* (emphasis added) (citing *Akeva L.L.C. v. Mizuno Corp., 243 F. Supp. 2d 418, 423 (M.D.N.C. 2003).* The *Echostar* Court reiterated that the [*9] attorney-client privilege is at the discretion of the client. The client can waive the privilege when it invokes the advice of counsel defense or decline to assert the advice of counsel defense and maintain the attorney-client privilege. n3 What a client cannot do is use the privilege as both a sword and a shield by waiving its privilege for favorable advice while asserting it for unfavorable advice. Indeed, "the overarching goal of waiver" is to prevent a party from using advice as both a sword and a shield. *448 F.3d at 1303.*

n3 As a result of *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp, 383 F.3d 1337 (Fed. Cir. 2004),* a decision not to invoke the advice of counsel defense and to maintain the attorney-client privilege no longer results in an adverse inference that any withheld opinions are adverse to the client.

The *EchoStar* Court then turned to the scope of waiver of work product immunity. The Court explained that work-product waiver extends only to "factual" [*10] or "non-opinion" work product concerning the same subject matter as the disclosed work product. *Id at 1302.*

Acknowledging that the line between factual and opinion work product can be less than clear, the Federal Circuit directed courts to "balance the policies to prevent sword and shield litigation tactics with the policy to protect work product." *Id.* The Court then went on to discuss three categories of work product potentially relevant to the advice of counsel defense: "(1) documents that embody a communication between the attorney and client concerning the subject matter of the case, such as a traditional opinion letter; (2) documents analyzing the law, facts, trial strategy, and so forth that reflect the attorney's mental impressions but were not given to the client; and (3) documents that discuss a communication between attorney and client concerning the subject matter of the case but are not themselves communications to or from the client." *Id. at 1302* (citing *Thorn EMI N. Am. v. Micron Tech., 837 F. Supp. 616, 622-623 n.3 (D. Del. 1993)).* The *EchoStar* Court found that as to the first category the work-product immunity is waived. As to the second [*11] category, it is not waived. As to the third category, the privilege is waived but only insofar as the document contains a substantive reference to what was communicated to the client.

In reaching this result, the *EchoStar* Court was guided by the maxim that waiver extends only so far as to inform the court of the infringer's state of mind. "Counsel's opinion is not important for its legal correctness. It is important to the inquiry [of] whether it is 'thorough enough as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed or unenforceable.'" *Id. at 1303* (quoting *Ortho Pharm Corp. v. Smith, 959 F.2d 936, 944 (Fed.Cir. 1992).* "It is what the alleged infringer knew or believed . . . that informs the court of an infringer's willfulness." *Id.* Accordingly, the Court concluded that "when an alleged infringer asserts its advice-of -counsel defense regarding willful infringement of a particular patent, it waives its immunity for any document or opinion that embodies or discusses a communication to or from it concerning whether that patent is valid, enforceable and infringed by [*12] the accused. This waiver of both the attorney-client privilege and the work- product immunity includes not only any letters, memorandum, conversation, or the like between the attorney and his client, but also includes, when appropriate, any documents referencing a communication between attorney and client." *Id. at 1304.*

The *EchoStar* Court also addressed the question of imposing temporal limitations on the waiver of attorney-client privilege and work-product immunity resulting from the advice of counsel defense. In cases where ongoing infringement is at issue, the waiver extends to advice and work product communicated to the client after the

litigation has begun. *Id.* at 1303 n.4 (citing *Akeva LLC,* 243 F. Supp. 2d at 423).

*EchoStar* leaves this Court of the firm opinion that the Special Master's Report and Recommendation is neither clearly erroneous nor contrary to law. The scope of CA's waiver of the attorney-client privilege and work-product doctrine lies within the sound discretion of the trial court and *EchoStar* provides ample support for the Special Master's recommendations.

The Special Master's holding that the waiver extends to trial counsel [*13] is consistent with *EchoStar.* n4 *EchoStar* did not involve trial counsel. However, the *EchoStar* Court, in describing the scope of the waiver of the attorney-client privilege, cited favorably to *Akeva,* wherein the Court held that "all opinions received by the client relating to infringement must be revealed, even if they come from defendants' trial attorney." 243 F. Supp. 2d at 423. The supporting citation to *Akeva* in describing the scope of the waiver, together with the reasoning of the *Echostar* Court, indicates to this Court that the Federal Circuit would extend the waiver to all attorneys who provided advice, including, in the case of ongoing infringement, trial counsel. Excluding trial counsel from the scope of the waiver would permit a party to use the attorney-client privilege as both a sword and shield by allowing a party to choose which opinions are disclosed and which are not.

> n4 Courts that have considered the issue of waiver with respect to trial counsel, both before and after *EchoStar,* have not arrived at any consistent rulings. *See, e.g., Affinion Net Patents, Inc. v. Maritz, Inc.* 440 F. Supp. 2d 354, 356 (D. Del. 2006); *Ampex Corp. v. Eastman Kodak Co.,* 2006 U.S. Dist. LEXIS 48702 at *9 (D. Del. July 17, 2006); *Convolve, Inc. v. Compaq Computer Corp.,* 224 F.R.D. 98, 103-104 (S.D.N.Y. 2004); *Sharper Image Corp. v. Honeywell Int'l Inc.,* 222 F.R.D. 621, 643 (N.D. Cal. 2004).

[*14]

The Court is cognizant of the fact that the attorney-client privilege exists in order to promote full and honest disclosure between attorney and client. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981); *Knorr-Bremse,* 383 F.3d at 1345. However, the decision to waive the privilege is within the control of the alleged infringer and is, presumably, one of the factors that will be weighed in determining whether to assert the advice of counsel defense. Given that the decision whether or not to assert the advice of counsel defense is no longer tainted by the possibility of

an adverse inference, any intrusion into the attorney-client relationship is not undue. Moreover, applying the waiver to trial counsel does not grant Simple the unfettered right to rummage through counsel's files. *See EchoStar,* 448 F.3d at 1303. Litigation strategy and advice of counsel are not the same and the Special Master's Recommendation recognized the difference by providing CA an opportunity to submit materials for his *in camera* review.

Rejection of CA's temporal limitation was also appropriate. First, on-going infringement is at issue here and therefore [*15] CA's state of mind throughout this litigation remains relevant and advice that CA may have received from any counsel is relevant to CA's state of mind. Second, establishing the commencement of this action as a temporal limitation on the waiver of the attorney-client privilege vis-a-vis trial counsel seems incongruous given that the opinions of Cooper & Dunham were rendered after the commencement of the action and current trial counsel appeared in this action approximately two years after the commencement of this action.

In its Reply in support of its objections to the Special Master's Report and Recommendation, CA raises for the first time, bifurcation of the willfulness determination until such time as the jury finds the patent infringed as a way of meeting the attorney-client privilege problem. The propriety of bifurcation will only be addressed upon a properly presented motion.

Lastly, the Court notes CA's suggestion that the basis for Simple's motion to compel has been rendered moot in view of the Special Master's Report and Recommendation of noninfringement. Suffice it to say that given the parties voluminous objections to the Reports and Recommendations issued by the Special [*16] Master on, for example, the subjects of claim construction, infringement and validity, which objections are pending before this Court, the suggestion of mootness is not well taken.

*CONCLUSION*

The Court adopts the Special Master's Report and Recommendation, dated November 24, 2004 and grants Simple's motion to compel.

**SO ORDERED.**

Dated: Central Islip, New York

    October 20, 2006

    Denis R. Hurley

    United States Senior District Judge

# EXHIBIT K

LEXSEE 2006 U.S. DIST. LEXIS 74060

**OUTSIDE THE BOX INNOVATIONS, LLC, d/b/a UNION RICH USA, Plaintiff
Counter-Defendant, v. TRAVEL CADDY, INC., and ROOSTER PRODUCTS, d/b/a
THE ROOSTER GROUP, Defendants. TRAVEL CADDY, INC., Counter-Plaintiff
Counter-Defendant, v. OUTSIDE THE BOX INNOVATIONS, LLC, d/b/a UNION
RICH USA; UNION RICH PLASTIC FACTORY, LTD.; BONAKA LIMITED,
Counter-Defendants.**

CIVIL ACTION No. 1:05-cv-2482-ODE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
GEORGIA, ATLANTA DIVISION

*2006 U.S. Dist. LEXIS 74060*

**October 5, 2006, Decided
October 6, 2006, Filed**

**COUNSEL:** [*1] For Outside The Box Innovations, LLC doing business as Union Rich USA, Plaintiff: Joel D. Myers, LEAD ATTORNEY, Myers & Kaplan, Atlanta, GA; Ashish D. Patel, Myers & Kaplan, Atlanta, GA; Barry E. Kaplan, Myers & Kaplan Intellectual Property Law, LLC, Atlanta, GA.

For Travel Caddy, Inc., Rooster Products doing business as The Rooster Group, Defendants: Aimee B. Kolz, LEAD ATTORNEY, Jason S. Shull, LEAD ATTORNEY, Jon O. Nelson, LEAD ATTORNEY, Marc S. Cooperman, LEAD ATTORNEY, Scott A. Burow, LEAD ATTORNEY, Banner & Witcoff, Chicago, IL; George Melton Mobley, Jr., LEAD ATTORNEY, Lokey, Mobley & Doyle, LLP, Atlanta, GA; Kimberly Blackwell Sheridan, Lokey & Smith, Atlanta, GA.

For Rooster Products doing business as The Rooster Group, Rooster Products, Travel Caddy, Inc., Counter Claimants: Aimee B. Kolz, LEAD ATTORNEY, Jason S. Shull, LEAD ATTORNEY, Jon O. Nelson, LEAD ATTORNEY, Marc S. Cooperman, LEAD ATTORNEY, Scott A. Burow, LEAD ATTORNEY, Banner & Witcoff, Chicago, IL; George Melton Mobley, Jr., LEAD ATTORNEY, Lokey, Mobley & Doyle, LLP, Atlanta, GA.

For Mandy Wilson Decker, Movant: Ronald Scott Griffin, LEAD ATTORNEY, Stites & Harbison, Atlanta, GA.

For Outside The [*2] Box Innovations, LLC, Counter Defendant: Joel D. Myers, LEAD ATTORNEY, Myers & Kaplan, Atlanta, GA; Ashish D. Patel, Myers & Kaplan, Atlanta, GA.

For Travel Caddy, Inc., Counter Claimant: Aimee B. Kolz, Marc S. Cooperman, LEAD ATTORNEY, Banner & Witcoff, Chicago, IL.

For Bonaka Limited, Bonaka Plastic Manufacturing Co., Ltd., Union Rich Plastic Factory, Ltd., Counter Defendants: Joel D. Myers, LEAD ATTORNEY, Myers & Kaplan, Atlanta, GA; Ashish D. Patel, Myers & Kaplan, Atlanta, GA; Barry E. Kaplan, Myers & Kaplan Intellectual Property Law, LLC, Atlanta, GA.

For Travel Caddy, Inc., Rooster Products, Counter Defendants: Aimee B. Kolz, LEAD ATTORNEY, Banner & Witcoff, Chicago, IL.

**JUDGES:** ORINDA D. EVANS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ORINDA D. EVANS

**OPINION:**

ORDER

This case is before the Court pursuant to its oral direction made during the hearing held August 24, 2006 concerning Travel Caddy's subpoena issued to Mandy Wilson Decker.

On August 7, 2006, Travel Caddy issued a subpoena for deposition and for production of documents in the Western District of Kentucky to a non-party in this case,

Mandy Wilson Decker [# 185]. On August 9, 2006, Union Rich filed an Emergency [*3] Motion for Protective Order Regarding the Deposition of Mandy Wilson Decker [# 187]. At the August 24 hearing, the motion for protective order was granted and the Court directed the parties to file briefs on the subject of whether, and to what extent, Union Rich had waived attorney-client privilege and work-product immunity by relying on the advice-of-counsel defense to Travel Caddy's patent infringement claims. By order dated August 25, 2006, the Court ordered that the subpoena for deposition and for production of documents and related motions filed in the Western District of Kentucky which were presented at the hearing be made a part of the record in this case by Order dated [# 232].

The Court notes that Union Rich, Travel Caddy, and Ms. Decker have filed briefs with the Court on this issue [# s 243, 244, 245, 254, 255].

Ms. Decker, an associate at the law firm of Stites & Harbison, served as the initial opinion counsel to Union Rich in connection with what ultimately became the present lawsuit. In this role, Ms. Decker provided opinion letters to Union Rich on potential infringement issues related to the two patents-in-suit, the '992 and the '104 patent. Stites & [*4] Harbison also served as Union Rich's original litigation counsel, and filed this lawsuit on behalf of Union Rich. As a defense to the charges of willful patent infringement subsequently brought by Travel Caddy, Union Rich has adopted the advice-of-counsel defense. Travel Caddy is seeking to depose Ms. Decker in connection with her role as opinion counsel.

In addition to deposing Ms. Decker, Travel Caddy has demanded the production of certain documents, through a subpoena served on Ms. Decker as an individual. Specifically, and central to the present dispute over the scope of waiver of privilege, is Travel Caddy's request for:

> All documents that reflect communications (including all electronic communications) between Union Rich and any attorney at the law firm of Stites & Harbison that relate to the scope, validity, infringement, and/or enforceability of the '992 and '104 patents, including any and all attorney notes, summaries, documents and drafts of documents related to the same subject matters and that embody or discuss a communication between an attorney at Stites & Harbison and Union Rich.

(Notice of Deposition of Mandy Wilson Decker, Exhibit A [# 185]). Both [*5] Union Rich and Ms. Decker independently object to this request.

All interested parties agree that this Court should be guided by the holding of In re Echostar, a recent Federal Circuit decision that has addressed the scope of waiver of privilege in the context of an advice-of-counsel defense to willful patent infringement. *448 F.3d 1294, 1298 (Fed. Cir. 2006)*. In adopting the advice-of-counsel defense, the alleged infringer waives aspects of both the attorney-client privilege and work-product immunity, but these waivers are not the same in scope, and neither is absolute. *Id. at 1300-01*. Because the advice-of-counsel defense "requires the court to decide, inter alia, whether counsel's opinion was thorough enough to 'instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable,'" the focus in determining the scope of waiver is on the act of communicating an opinion from counsel to client. *Id. at 1305* quoting, *Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 944 (Fed. Cir. 1992)*.

With respect to the attorney-client privilege, the Federal Circuit held that, [*6] "when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter." *Id. at 1301*. This broad waiver explicitly covers opinions that were communicated by Ms. Decker to Union Rich, and is the reason that Union Rich made no issue with, and produced to Travel Caddy, the opinions requested in the original subpoena. (Notice of Deposition of Mandy Wilson Decker, Exhibit A [# 185]). With respect to work product immunity, the Federal Circuit held that such immunity is waived "for any document or opinion that embodies or discusses a communication to or from [an accused infringer] concerning whether that patent is valid, enforceable, and infringed by the accused." *Echostar, 448 F.3d at 1304*. In general terms, the application of Echostar to this case dictates that, "[attorney] work product that was not communicated to [Union Rich] or does not reflect a communication is not within the scope of [Union Rich's] waiver because it obviously played no part in [Union Rich's] belief as to infringement of the ['992 and '104] patent[s]." *Id. at 1305*. [*7] This general statement does not address all of the parties' arguments, however.

Union Rich argued at the Markman hearing on August 24, 2006, that Ms. Decker provided no opinion as to the validity of the '104 patent, and Ms. Decker argued in the Response of Non-Party Mandy Wilson Decker, Esg. to Travel Caddy Inc.'s Subpoena for Deposition and Production of Documents [# 243] that she must only testify as to the validity of the '992 patent. Union Rich appears to have abandoned this argument in its filings on the

scope of waiver, and has acknowledged that it "makes no issue in producing all 'opinions of counsel' provided to and relied upon by the client [], and has done so." (Union Rich's Memorandum Regarding Scope of Waiver of Privilege, at 3 [# 245]). If Union Rich has indeed produced all such documents, then the dispute over whether Ms. Decker provided an opinion as to the scope, validity, infringement and/or enforceability of the '104 Patent is moot.

However, Ms. Decker argued in her filings that she did not provide an opinion on the '104 Patent, only the '992 Patent and the application for what would become the '104 Patent. Ms. Decker also argued that any advice on the [*8] '104 Patent application is outside the scope of waiver, as defined by Travel Caddy. According to Ms. Decker, because there can be no infringement until a patent is issued, and because Travel Caddy has stated that the scope of waiver is limited to "advice received during the entire course of infringement," Ms. Decker's advice on the '104 application is protected by the waiver.

The Court agrees with Travel Caddy that by giving her opinion on the '104 Patent application, Ms. Decker gave her opinion on the '104 Patent, and Union Rich has therefore waived its privilege with respect to the requested communications. First, the claims of the '104 Patent are identical to the claims that appeared in the '104 Patent application reviewed by Ms. Decker. Second, the alleged infringement in this case began with the '992 Patent, and the '104 Patent is a continuation of the '992 Patent. Therefore, while there can be no infringement until a patent is issued, advice about a pending continuation patent is highly relevant to the central issue in willful infringement, the state of mind of the alleged infringer.

Ms. Decker has also raised the argument that much of what Travel Caddy has demanded she produce, [*9] through a subpoena of her as an individual, is beyond her legal ability to produce. (Response of Non-Party Mandy Wilson Decker, at 7 [# 243]). Travel Caddy interprets the Echostar decision as requiring Union Rich to "produce all communications that embody or reflect communications between Union Rich and any counsel -- not merely Ms. Decker. This includes communications with other attorneys at Ms. Decker's firm, as well as communications with litigation counsel." (Defendants' Submission Concerning the Scope of Union Rich's Waiver of Privilege, at 10 [# 244]). Travel Caddy is correct that the Echostar decision held that if a defendant relies on the advice-of-counsel defense with respect to advice received from in-house counsel, then the waiver of attorney-client privilege applies to advice "relating to the same subject matter" received from other counsel. Echostar, 448 F.3d at 1299. However, a subpoena served

on Ms. Decker is not the appropriate method for procuring the requested documents.

Ms. Decker, as an associate at Stites & Harbison, cannot produce documents under the control of Myers & Kaplan, Union Rich's current litigation counsel, nor can she [*10] produce documents that are controlled by her own law firm. Rule 45(a)(1)(C) limits the production of documents available through a subpoena to "documents or tangible things in the possession, custody or control of that person." Fed. R. Civ. P. 45(a)(1)(C).

Travel Caddy has argued that it is entitled to communications that occurred after the commencement of this lawsuit. The Federal Circuit stated in a footnote that privilege is waived, "when the advice is relevant to ongoing willful infringement, so long as that ongoing infringement is at issue in the litigation." Id. at 1302 n.4. However, the requirement that the advice be communicated to the alleged infringer remains, even when applied to advice that occurs after the commencement of litigation. Id. at 1302.

While Echostar instructs courts to be mindful of a litigant attempting to "use[] the attorney-client privilege as both a sword and a shield," 448 F.3d at 1301, the Court will not grant Travel Caddy "unfettered discretion to rummage through all of [Union Rich's] files and pillage all of [Union Rich's] litigation strategies." [*11] Echostar, 448 F.3d at 1303. In other words, litigation strategy is not the same as advice-of-counsel, and the waiver that has been clarified in Echostar should not be used to allow unfettered access to documents related to strategy from all attorneys who have been involved in an infringement case.

The Federal Circuit imposed important limits on the scope of the waiver as follows, "[w]hile an accused infringer may waive the immunity for work product that embodies an opinion in letters and memorandum communicated to the client, he does not waive the attorney's own analysis and debate over what advice will be given." Id. Furthermore, while the district court in Echostar, reached the same conclusion that privilege is waived for communications made after the start of a lawsuit, it also found that the alleged infringer was entitled to redact information "that it considers solely related to trial strategy." TIVO Inc. v. EchoStar Comm. Corp., 2005 U.S. Dist. LEXIS 42481, No. CIVA 2:04CV1 (DF), 2005 WL 4131649, at *8 (Sept. 26, 2005). This conclusion is consistent with the Federal Circuit's holding that the scope of waiver of privilege does include post-filing communications, [*12] but prevents the unfettered access to litigation strategy that concerned the Court. Echostar, 448 F.3d at 1302-03; see also Tivo, 2005 U.S. Dist. LEXIS 42481, 2005 WL 4131649, at *8 ("This, in the Court's opinion, reconciles the fear that such discovery could

compromise trial preparation and give Plaintiff an unfair advantage with Plaintiff's inquiry into state of mind.").

Finally, Echostar makes clear, and all parties agree, that Ms. Decker is permitted to redact or withhold documents or information that were never communicated to Union Rich. *Id. at 1303.* This right to redact is especially important in the context of documents "that reference and/or describe a communication between the attorney and client, but were not themselves actually communicated to the client." *Id. at 1304.*

Therefore, it is ordered that, with respect to Ms. Decker's subpoena, she be required to produce:

All documents that reflect communications (including all electronic communications) between Ms. Decker and Union Rich that relate to the scope, validity, infringement, and/or enforceability of the '992 and '104 patents, including any and all attorney notes, summaries, documents [*13] and drafts of documents related to the same subject matters and that embody or discuss a communication between Ms. Decker and Union Rich. Any such document that includes Ms. Decker's opinions or mental impressions never communicated to Union Rich may be redacted to exclude those uncommunicated portions. Ms. Decker may redact any information that she considers solely related to trial strategy. Furthermore, consistent with the Echostar holding, the overall

scope of Union Rich's waiver in relying on the advice-of-counsel defense includes:

Any document or opinion that embodies or discusses a communication to or from Union Rich concerning whether the '992 and '104 patents are valid, enforceable, and infringed by Union Rich, regardless of the counsel involved, and regardless of the date. Any document or opinion that falls within the scope of the waiver, but which includes opinions or mental impressions never communicated to Union Rich, may be redacted to exclude those uncommunicated portions. Union Rich may redact any information that it considers solely related to trial strategy.

Accordingly, non-party Mandy Wilson Decker is directed to comply with Travel Caddy's [*14] subpoena for deposition and production of documents [# 185] as stated herein.

SO ORDERED, this 5 day of October, 2006.

ORINDA D. EVANS

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATIC CONTROL COMPONENTS, INC.,

    PLAINTIFF/COUNTERCLAIM
    DEFENDANT

v.

LEXMARK INTERNATIONAL, INC.,

    DEFENDANT/COUNTERCLAIM
    PLAINTIFF

v.

WAZANA BROTHERS INTERNATIONAL,
INC. d/b/a MICRO SOLUTIONS ENTERPRISES

    COUNTERCLAIM DEFENDANT

v.

PENDL COMPANIES, INC.

    COUNTERCLAIM DEFENDANT

v.

NER DATA PRODUCTS, INC.

    COUNTERCLAIM DEFENDANT

Civil Action No. 04-CV-84-GFVT
Pending in United States District Court
East District of Kentucky
Honorable Gregory F. Van Tatenhove

Miscellaneous Action No. 06-00474-GK

**PROPOSED ORDER DENYING MOTION TO QUASH SUBPOENA**

Upon consideration of the motion of McDermott Will & Emery LLP ("McDermott"), a

law firm representing counterclaim defendant Static Control Components, Inc. ("Static Control")

in the above-captioned litigation pending in the Eastern District of Kentucky, Civil Action No.

04-CV-84-GFVT, to quash the subpoena served upon it by defendant/counterplaintiff Lexmark

International, Inc. ("Lexmark") and for attorney's fees opposes incurred its client, Static Control,

in connection with the filing of the motion, it is hereby ORDERED as follows:

1.    McDermott's motion to quash is denied in its entirety, including McDermott's
      request for attorney's fees.

2.    Within five (5) business days of this Order, to the extent that McDermott wishes
      to withhold or redact documents that would reveal trial strategy or planning, it
      shall submit those documents for this court's in camera review.

3.    Within ten (10) business days of this Order, McDermott shall produce all
      documents and provide deposition testimony responsive to Lexmark's subpoena
      to McDermott.

SIGNED and ENTERED this _____ day of _____, 2006.

_____
United States District Judge